**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **SOVEREIGN PEAK** | § | |
| **VENTURES, LLC,** | § | |
| **Plaintiff,** | § | |
| | § | **CASE NO. 1:25-cv-1574** |
| **v.** | § | |
| | § | |
| **NXP SEMICONDUCTORS** | § | **JURY TRIAL** |
| **N.V., NXP B.V., and NXP** | § | |
| **USA, Inc.,** | § | |
| **Defendants.** | § | |

## COMPLAINT AND JURY DEMAND

Plaintiff Sovereign Peak Ventures, LLC alleges the following in support of

this action against Defendants NXP Semiconductors N.V, NXP B.V., and NXP

USA Inc. (collectively, "NXP") for infringement of U.S. Patent Nos. 7,796,512,

8,045,531, 8,270,384, 8,552,684, 8,963,490, and 9,620,282:

### THE PARTIES

1.     Plaintiff, Sovereign Peak Ventures, LLC ("SPV"), is a Texas Limited

Liability Company with its principal place of business in Allen, Texas.

2.     Defendant NXP Semiconductors N.V. is a foreign corporation

organized and existing under the laws of Netherlands with a principal place of

business located at High Tech Campus 60, 5656 AG Eindhoven, The Netherlands.

3.     Defendant NXP B.V. is a foreign corporation organized and existing

under the laws of the Netherlands with a principal place of business located at

High Tech Campus 60, 5656 AG Eindhoven, The Netherlands. NXP B.V. is a wholly owned subsidiary of NXP Semiconductors N.V. and develops, markets, and sells semiconductor devices.

4.    Defendant NXP USA, Inc. is a corporation organized and existing under the laws of Delaware. NXP USA, Inc. has places of business inside this judicial district, including its US Corporate Headquarters located at 6501 W. William Cannon Dr., Austin TX 78735. *See* https://www.nxp.com/company/about-nxp/worldwide-locations/united-states:USA

5.    NXP USA, Inc. was formerly known as Freescale Semiconductor, Inc. Following NXP's merger with Freescale in 2016, Freescale Semiconductor, Inc. changed its name to NXP USA, Inc. and became NXP N.V.'s registered agent in the United States.

6.    NXP USA, Inc. may be served with process through its registered agent Corporation Service Company – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

7.    NXP is a global semiconductor company that designs, manufactures, and provides to the United States and other markets a wide variety of semiconductors that are used in a wide range of end-market applications, such as automotive, industrial and Internet of Things (IoT), mobile, and communication infrastructure.

## JURISDICTION AND VENUE

8.      SPV brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      Venue is proper as to NXP N.V. and NXP B.V. under 28 U.S.C. § 1391(c)(3) in that they are not residents of the United States and may, therefore, be sued in any judicial district. *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.,* 406 U.S. 706, 714 (1972).

10.      Venue is proper as to NXP USA under 28 U.S.C. §§ 1400(b) because NXP has committed acts of infringement and has a regular and established place of business in this district. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1521 (2017).

11.      In prior patent infringement actions, this Court has exercised personal jurisdiction of NXP USA, which did not contest jurisdiction or venue in this district.

12.      Joinder of NXP N.V., NXP B.V., and NXP USA is proper because they are related parties who are either jointly and severally liable for infringement, or who make, use, sell, offer for sale, or import the same or similar Accused Products that practice the same Asserted Patents. NXP N.V., NXP B.V., and NXP

USA use the same underlying hardware and/or software in their infringing products and therefore the factual question of infringement will substantially overlap between NXP N.V., NXP B.V., and NXP USA.Plaintiff anticipates that there will be substantial overlap during the discovery process.

13.    NXP has committed acts of infringement in this district giving rise to this action and does business in this district, including making sales and/or providing service and support for its respective customers in this district. NXP purposefully and voluntarily sold one or more of the infringing products with the expectation that they would be purchased by consumers in this district and/or incorporated into products that would be purchased by consumers in this district. These infringing products have been and continue to be purchased by consumers in this district. NXP has committed acts of patent infringement within the United States, the State of Texas, and the Western District of Texas.

## THE SOVEREIGN PEAK VENTURES PATENTS AND HOW NXP INFRINGES THEM

14.    SPV owns a portfolio of patents invented by employees of Panasonic Corporation.  Since its founding in 1918, Panasonic has been at the forefront of the electronics industry for over a century.  Since acquiring the Panasonic portfolio, SPV has promoted the adoption of technologies claimed in the Panasonic portfolio and has entered into license agreements with numerous companies.

15.    Over the years, Panasonic has innovated in the home appliance,

battery, mobile phone, and television industries.  Panasonic's invention of the

"Paper Battery" in 1979 is widely credited as enabling the compact electronics of

today.  In 1991, Panasonic released the Mova P, the smallest and lightest mobile

phone on the market, which revolutionized the industry by demonstrating the

public's demand for a compact, lightweight device.  Panasonic also produced the

first wide-format plasma display and developed the first digital television for the

U.S. market.

16.    Panasonic's history of innovation is borne out by its intellectual

property.  Searching the Patent Office's database for Panasonic as patent assignee

yields more than 27,000 matches.

*17.*    Marking its centennial in 2018, Panasonic opened the Panasonic

Museum to showcase its history of design philosophy and innovation.



**NXP INFRINGES U.S. PATENT NUMBER 7,796,512**

18.    The Patent Office issued U.S. Patent No. 7,796,512, titled "Switching Source Device, Switching Destination Device, High Speed Device Switching System and Signaling Method" on September 14, 2010, after a thorough examination and determination that the subject matter claimed is patentable.

19.    Claim 1 of the '512 patent recites:

A switching source device for moving a session established with a communication counterpart to a switching destination device, comprising:

a service discovery section for obtaining information as to whether a service can be provided from a neighboring communication device;

a high speed device switching section for instructing the service discovery section at an arbitrary timing to inquire whether a service can be provided, determining a switching destination candidate device that is a switching destination of a session based on the obtained information as to whether the service can be provided, generating a switching destination candidate device list describing the switching destination candidate devices, and making an instruction for establishing a session with the switching destination candidate device;

a signaling section for establishing a session with the switching destination candidate device when the instruction for establishing a session

is received from the high speed device switching section and;

an input section for receiving a switching destination candidate device list request from a user; and

an output section for presenting the switching destination candidate device list when the high speed device switching section receives the switching destination candidate device list request through the input section;

wherein when the high speed device switching section receives a device switching request from a user through the input section, it notifies the signaling section of the device selected from the switching candidate device list, and the signaling section sends a switching instruction to the selected device.

20.    NXP devices that infringe the '512 patent include any NXP Wi-Fi System on Chip (SoC) that supports 802.11k/r. Exemplary infringing products include at least the products within the 88W8782, 88W8977, 88W8987, 88W8997, 88Q9098, 88W9098, 88MW32X, AW611, AW690, AW692, AW693, IW416, IW610, IW611, IW612 and IW620 families. These infringing products include at least the following having NXP product identifiers, including 88MW320-A0-NAPC, 88MW320-A0-NAPE, 88MW320-A0-NAPI, 88MW322-A0-NXUC, 88MW322-A0-NXUE, 88MW322-A0-NXUI, 88W8801-BO-NMDC, 88W8801-BO-NMDE, 88W8801-BO-NMDI, 88W8977-A1-NMVE, 88W8987-A2-EAHE,

88W8987-A2-NYEA, 88W89987-A2-NYEE, 88W8987-A2-NYEI, 88W8987Sa2-NYEA, 88W8997-A1-CBQE, AW611HN, AW690HNK, AW690HNB, AW692, AW693PHNB, IW416HN, IW416UK, IW610BHN, IW610CUK, IW610FHN, IW610FUK, IW610GHN, IW610GUK, IW611HN, IW611UK, IW612UK, IW612HN and IW620HN along with all other NXP products having substantially similar function, structure, and/or operation. *See e.g.,* https://www.nxp.com/docs/en/application-note/AN14212.pdf.

21.    The '512 Accused Products include a switching source device for moving a session established with a communication counterpart to a switching destination device.  For example, the '512 Accused Products are WAN Access Points (APs) (*e.g.,* switching source device) that contain NXP's Wi-Fi SoCs (*e.g.,* 88MW320/322) and assist connected clients with roaming to a switching destination device (*e.g.,* destination AP).

---

**More about 88MW32X**

The 88MW320/322 Wi-Fi® Microcontroller system-on-chip (SoC) is a highly integrated, low-power chip with a full-featured microcontroller built using Arm® Cortex®-M4F CPU and 802.11 b/g/n Wi-Fi®. Designed for a broad array of smart devices for home, enterprise and industrial automation, and smart accessories, the SoC is optimized for:

- Ultra low system cost
- Low-power operation including enabling battery operated devices
- Secure operation
- Enabling feature-rich functionality enabling manufacturers to create innovative, differentiated products and services
- 88MW32x is supported by AWS IoT Starter SDK and MCUXpresso SDK.

Wireless modules based on the NXP 88MW32X are offered by leading module manufacturers.

Less ^

All information for 88MW32X ›

---

https://www.nxp.com/part/88MW320-A0-NAPC.

---

**IEEE 802.11 Standards**
- 802.11 data rates of 1 and 2 Mbps
- 802.11b data rates of 5.5 and 11 Mbps
- 802.11g data rates 6, 9, 12, 18, 24, 36, 48, and 54 Mbps for multimedia content transmission
- 802.11g/b performance enhancements
- 802.11n compliant with maximum data rates up to 72.2 Mbps (20 MHz channel)
- 802.11d international roaming
- 802.11e quality of service
- 802.11h transmit power control
- 802.11i enhanced security
- 802.11k radio resource measurement
- 802.11n block acknowledgment extension
- 802.11r fast hand-off for AP roaming
- 802.11w protected management frames
- Fully supports clients (stations) implementing IEEE Power Save mode
- Wi-Fi direct connectivity

---

https://www.nxp.com/docs/en/data-sheet/88MW320-88W322.pdf at p. 4.

22.    The '512 Accused Products include AP devices using NXP's Wi-Fi SoCs that support 802.11k/r.  These Accused Products are switching source devices for moving a session with connected clients to switching destination devices, or APs to which the client may choose to roam.

---

**5.2.7.9 Neighbor report**

The neighbor report request is sent to an AP, which returns a neighbor report containing information about known neighbor APs that are candidates for a service set transition. Neighbor reports contain information

---

from the table dot11RRMNeighborReportTable in the MIB concerning neighbor APs. This request/report pair enables a STA to gain information about the neighbors of the associated AP to be used as potential roaming candidates.

---

IEEE Standard 802.11.k – 2008 (Amendment to IEEE Standard 802.11 - 2007)

https://sci-hub.ru/10.1109/IEEESTD.2008.4544755 at pp. 27, 28.

> **4.5.4.8 Fast BSS transition**
>
> The FT mechanism defines a means for a STA to set up security and QoS parameters prior to reassociation to a new AP. This mechanism allows time-consuming operations to be removed from the time-critical reassociation process.

IEEE Standard 802.11 - 2012 Edition
https://scihub.ru/10.1109/IEEESTD.2012.6361248 at p. 76.

      23.    The '512 Accused Products are Wi-Fi SoCs that support 802.11k/r,

including a service discovery section for obtaining information used to compile a

neighbor report.

> **10.11.10 Usage of the neighbor report**
>
> **10.11.10.1 General**
>
> A neighbor report is sent by an AP and it contains information on neighboring APs that are members of ESSs requested in the neighbor report request. A neighbor report may not be exhaustive either by choice, or due to the fact that there may be neighbor APs not known to the AP. The neighbor report contents are derived from the NeighborListSet parameter of the MLME-NEIGHBORREPRESP.request primitive. The mechanism by which the contents of this table are determined is outside the scope of this standard, but it may include information from measurement reports received from the STAs within the BSS, information obtained via a management interface, or the DS.

IEEE Standard 802.11 - 2012 Edition https://sci-
hub.ru/10.1109/IEEESTD.2012.6361248 at p. 1078.



The BSSID Information field can be used to help determine neighbor service set transition candidates. It is 4 octets in length and contains the subfields as shown in Figure 8-216.

| B0         B1 | B2 | B3 | B4         B9 | B10 | B11 | B12   B31 |
|---|---|---|---|---|---|---|
| AP Reachability | Security | Key Scope | Capabilities | Mobility Domain | High Throughput | Reserved |

Bits:           2          1          1          6          1          1          20

**Figure 8-216—BSSID Information field**

The AP Reachability field indicates whether the AP identified by this BSSID is reachable by the STA that requested the neighbor report. For example, the AP identified by this BSSID is reachable for the exchange of preauthentication frames as described in 11.5.9.2. The values are shown in Table 8-114.

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 581.

      24.    The '512 Accused Products include a service discovery section for obtaining information as to whether a service can be provided from a neighboring communication device.  For example, NXP's accused Wi-Fi SOCs that support 802.11 k/r include a service discovery section for obtaining information used to compile a neighbor report.



**8.4.2.41 BSS Average Access Delay element**

The BSS Average Access Delay element contains the AP Average Access Delay, which is a measure of load in the BSS and is available in both QoS APs and non-QoS APs. The format of the BSS Average Access Delay element is defined in Figure 8-223.

| Element ID | Length | AP Average Access Delay |
|---|---|---|

Octets:           1          1          1

**Figure 8-223—BSS Average Access Delay element format**

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 586.



Figure 8-227—BSS Available Admission Capacity element format

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 589.



Figure 8-241—RDE format

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 599.

25.    The '512 Accused Products include a high speed device switching section for instructing the service discovery section at an arbitrary timing to inquire whether a service can be provided, determining a switching destination candidate

device that is a switching destination of a session based on the obtained

information as to whether the service can be provided, generating a switching

destination candidate device list describing the switching destination candidate

devices, and making an instruction for establishing a session with the switching

destination candidate device.

26.    For example, NXP's accused Wi-Fi SoCs that support 802.11k/r

instruct their respective service discovery sections to inquire whether a service can

be provided by requesting beacon reports from connected clients at arbitrary times.

27.    The '512 NXP accused Wi-Fi SOCs that support 802.11k/r determine

switching destination candidate APs using information obtained by the service

discovery sections.  This determination may be made based on the BSSID of a

known AP, or based on information relating to an AP's settings and capabilities.



The BSSID is the BSSID of the BSS being reported. The subsequent fields in the Neighbor Report element pertain to this BSS.

The BSSID Information field can be used to help determine neighbor service set transition candidates. It is 4 octets in length and contains the subfields as shown in Figure 8-216.

| | B0 | B1 | B2 | B3 | B4    B9 | B10 | B11 | B12  B31 |
|---|---|---|---|---|---|---|---|---|
| | AP Reachability | Security | Key Scope | Capabilities | Mobility Domain | High Throughput | Reserved |
| Bits: | 2 | 1 | 1 | 6 | 1 | 1 | 20 |

**Figure 8-216—BSSID Information field**

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 581.

28.     NXP's '512 Accused Wi-Fi SoCs that support 802.11k/r generate a

neighbor list, describing the switching candidate APs.

---

The following MLME primitives support the signaling of neighbor report responses.

**6.3.33.2 MLME-NEIGHBORREPRESP.request**

**6.3.33.2.1 Function**

This primitive requests that a neighbor report response be sent. This may be in response to an MLME-NEIGHBORREPREQ.indication primitive or an autonomous request. It is valid only at a Radio Measurement capable AP.

**6.3.33.2.2 Semantics of the service primitive**

The primitive parameters are as follows:
```
MLME-NEIGHBORREPRESP.request(
                          PeerSTAAddress,
                          DialogToken,
                          NeighborListSet,
                          VendorSpecificInfo
                          )
```

| Name | Type | Valid range | Description |
|------|------|-------------|-------------|
| PeerSTAAddress | MACAddress | Any valid individual MAC address | The address of the STA's MAC entity to which a Neighbor Report Response frame is to be sent. |
| DialogToken | Integer | 0–255 | The Dialog Token to identify the neighbor report transaction. Set to the value received in the corresponding MLME-NEIGHBORREPREQ.indication primitive or to 0 for an autonomous report. |
| NeighborListSet | Set of Neighbor List elements each as defined in the Neighbor Report element format | As defined in 8.4.2.39 | A set of Neighbor List elements, each representing a neighboring AP being reported as defined in the Neighbor Report element format. |
| Vendor-SpecificInfo | A set of elements | As defined in 8.4.2.28 | Zero or more elements. |

---

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 198.

29.     The Neighbor Report element for each neighbor contains the AP's

respective BSSID, which is used to subsequently establish a Fast Transition

session with that AP.

> The target AP and the current AP need to reside in the same mobility domain to successfully exchange Remote Request frames. The RRB on the current AP shall transmit Remote Request frames to the target AP based on the BSSID of the target AP (supplied in the FT Action frames) using the same procedures as preauthentication, as described in 11.5.9.2.

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 1344.



Figure 8-215—Neighbor Report element format

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 581.

**8.5.9.2 FT Request frame**

The FT Request frame is sent by the STA to its associated AP to initiate an over-the-DS fast BSS transition.

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 758.



IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 759.

30.    The '512 Accused Products include a signaling section for establishing a session with the switching destination candidate device when the instruction for establishing a session is received from the high speed device switching section. For example, the Remote Request Broker (RRB) of an AP containing a NXP SoC establishes a session, over the DS, with the switching destination.

distribution system (DS): A system used to interconnect a set of basic service sets (BSSs) and integrated local area networks (LANs) to create an extended service set (ESS).

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 10.

> **12.10.2 Remote request broker (RRB)**
>
> The RRB resides in the SME on the APs and acts as a forwarding agent (at the current AP) and termination point (at the target AP) for protocol messages over the DS.
>
> The RRB allows APs that are part of the same mobility domain to exchange information over the DS. APs that advertise the same MDID shall be reachable over the DS and support the over-the-DS communication.
>
> As a termination point, when the RRB at the target AP receives a request frame from the current AP, it interacts with the MAC and other parts of the SME to process the request and respond with a Remote Response frame, through the RRB on the current AP, back to the requesting FTO.
>
> As a forwarding agent, when the RRB at the current AP receives a request from an FTO directed to another AP in the same mobility domain, the current AP forwards the request to that target AP. The RRB on the current AP converts Action frames into Remote Request frames and converts Remote Response frames into Action frames.

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 1344.

31.    The '512 Accused Products include an input section for receiving (*e.g.,* neighbor report request from connected users' device. For example, the '512 Accused Products include NXP's Wi-Fi SoCs that support 802.11k/r include an input section for receiving, e.g., neighbor report requests from connected users' devices.

> **10.11.10.3 Receiving a neighbor report**
>
> If dot11RMNeighborReportActivated is true, an AP receiving a neighbor report request shall respond with a Neighbor Report Response frame containing zero or more Neighbor Report elements. If an SSID element is specified in the corresponding Neighbor Report Request frame, the Neighbor Report element(s) shall contain information only concerning neighbor APs that are members of the current ESS identified by the SSID element contained within the neighbor report request. If the SSID element is omitted, the Neighbor Report element(s) shall contain information concerning neighbor APs that belong to the same ESS as the requesting STA. If the wildcard SSID element is specified in the corresponding Neighbor Request frame, the Neighbor Report element(s) shall contain information concerning all neighbor APs. If there are no neighbor APs available, the AP shall send a Neighbor Report Response frame with no Neighbor Report elements.
>
> If dot11RMNeighborReportActivated is false in an AP receiving a neighbor report request, it shall ignore the request and return a Neighbor Report frame with the Incapable bit in the Measurement Report Mode field set to 1.

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 1077.

32.    (1 e) NXP's Wi-Fi SoCs that support 802.11k/r include an output section for presenting the neighbor report to a connected client, in response to a neighbor report request.

33.    The '512 Accused Products include an output section for presenting the switching destination candidate device list when the high speed device switching section receives the switching destination candidate device list request through the input section.  For example, NXP's Wi-Fi SoCs that support 802.11k/r receive a switching request (FT Action Request) from a user's device, it sends a RemoteRequest to the Target AP.

---

**4.3.8.10 Neighbor report**

The neighbor report request is sent to an AP, which returns a neighbor report containing information about known neighbor APs that are candidates for a service set transition. Neighbor reports contain information from the table dot11RMNeighborReportTable in the MIB concerning neighbor APs. This request/report pair enables a STA to gain information about the neighbors of the associated AP to be used as potential roaming candidates.

---

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 54.

---

**10.11.10 Usage of the neighbor report**

**10.11.10.1 General**

A neighbor report is sent by an AP and it contains information on neighboring APs that are members of ESSs requested in the neighbor report request. A neighbor report may not be exhaustive either by choice, or due to the fact that there may be neighbor APs not known to the AP. The neighbor report contents are derived from the NeighborListSet parameter of the MLME-NEIGHBORREPRESP.request primitive. The mechanism by which the contents of this table are determined is outside the scope of this standard, but it may include information from measurement reports received from the STAs within the BSS, information obtained via a management interface, or the DS.

---

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 1077.

34.    The '512 Accused Products are configured such that wherein when the high speed device switching section receives a device switching request from a user through the input section, it notifies the signaling section of the device selected from the switching candidate device list, and the signaling section sends a switching instruction to the selected device.

35.    NXP's Accused Wi-Fi SOCs that support 802.11k/r receive a switching request (FT Action Request) from a user's device and sends a RemoteRequest to the Target AP.



**Figure 12-6—MLME interfaces for over-the-DS FT Protocol messages**

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 1318.

36.    The RemoteRequest message contains a switching instruction,

including, *e.g.*, instructions for the robust security network (RSN) association.

**12.8 FT authentication sequence**

**12.8.1 Overview**

The FT authentication sequence comprises four sets of FT elements. Each set of FT elements is referred to in 12.8 as a *message*. These messages are included in the FT Protocol frames or FT Resource Request Protocol frames to initiate a fast BSS transition. The FT authentication sequence is always initiated by the FTO and responded to by the target AP.

In an RSN, the first two messages in the sequence allow the FTO and target AP to provide association instance identifiers, SNonce and ANonce, respectively. SNonce and ANonce are chosen randomly or pseudorandomly and are used to generate a fresh PTK. The first two messages also enable the target AP to provision the PMK-R1 and the FTO and target AP to compute the PTK. The third and fourth messages demonstrate liveness of the peer, authenticate the elements, and enable an authenticated resource request.

IEEE Standard 802.11 - 2012 Edition https://sci-hub.ru/10.1109/IEEESTD.2012.6361248 at p. 1328.

**NXP INFRINGES U.S. PATENT NUMBER 8,045,531.**

37.    The Patent Office issued U.S. Patent No. 8,045,531, titled "System and Method for Negotiation of WLAN Entity" on October 25, 2011, after a thorough examination and determination that the subject matter claimed is patentable.

38.    Claim 1 of the '531 patent recites:

A system for providing service in a wireless local area network comprising:

a single or plurality of wireless access points (WAP) for processing a subset of complete functionality defined for the wireless local area network;

a single or plurality of control nodes (CN) for providing a subset or complete functionalities defined for the wireless local area network; and

a negotiation unit for the single or plurality of WAPs to dynamically

negotiate with the control node for a secure connection and function

split arrangement;

whereby the control node negotiates with the single or plurality of WAPs

using the negotiation unit and provides complementary functionality

for the single or plurality of each of the WAPs to form a complete

functionality defined for the wireless local area network according to a

decision of the negotiation unit.

39.    The NXP devices that infringe the '531 patent include at least the NXP
Access Point Systems that support configuration using the CAPWAP protocol to
provide service in a WLAN.  These infringing products include at least the
following NXP product codes: RDT1023WLAN and products providing the same
or similar functionality.  ("'531 Accused Products")

40.    The '531 Accused Products include a system for providing service in
a wireless local area network.  For example, NXP Access Point Systems support
configuration using the CAPWAP protocol to provide service in a WLAN. The
NXP QorIQ SOC can be used in the AC or WAP case for CAPWAP functional
divisions. NXP provides a system for providing service in a WLAN.



https://www.nxp.com/design/design-center/development-boards-and-designs/t1023-wlan-access-point-system:RDT1023WLAN.

This demo will provide three modes to show the CAPWAP offloading capability of QorIQ platform. mode Iis the core-through mode which can be implemented by the CAPWAP stack to send the CAPWAP stack packets; Mode II is the offloading-mode which demonstrates the CAPWAP Encapsulation/De-capsulation capability of the SoC, and can be used in the AC case; Mode III is the net-bridge mode which is the basic usage for EAP which bridge the packets from PCIE to SEC and FM for offloading CAPWAP manipulation, the bridge is zero-memory copy in order to get high performance data. Together with the throughput data, this demo will help the customer to evaluate the EAP design with QorIQ platform.

https://community.nxp.com/t5/NXP-Designs-Knowledge-Base/Secure-Tunnel-Offload-from-WLAN-AP-to-Switch/ta-p/1104046.



https://community.nxp.com/pwmxy87654/attachments/pwmxy87654/connects/94/1/AMF-NET-T2678.pdf.

41.    NXP Access Point Systems support configuration using the CAPWAP protocol in order to provide service in a WLAN. In this system, one QorIQ SoC is used in the case of the Access Controller (AC) managing the rest of the QorIQ Access Points (APs).

> **1.  Introduction**
>
> This document describes the CAPWAP protocol, a standard, interoperable protocol that enables an Access Controller (AC) to manage a collection of Wireless Termination Points (WTPs).  The CAPWAP protocol is defined to be independent of Layer 2 (L2) technology, and meets the objectives in "Objectives for Control and Provisioning of Wireless Access Points (CAPWAP)" [RFC4564].

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 7.

42.    The '531 Accused Products include a single or plurality of wireless access points (WAP) for processing a subset of complete functionality defined for the wireless local area network.  For example, NXP ACs manage one or more NXP APs.

```
CAPWAP assumes a network configuration consisting of multiple WTPs
communicating via the Internet Protocol (IP) to an AC.  WTPs are
viewed as remote radio frequency (RF) interfaces controlled by the
AC.  The CAPWAP protocol supports two modes of operation: Split and
Local MAC (medium access control).  In Split MAC mode, all L2
wireless data and management frames are encapsulated via the CAPWAP
protocol and exchanged between the AC and the WTP.  As shown in
Figure 1, the wireless frames received from a mobile device, which is
referred to in this specification as a Station (STA), are directly
encapsulated by the WTP and forwarded to the AC.
```

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 7.

43.    The WLAN functionality is distributed among the AC and APs in the network.

```
Provisioning WTPs with security credentials and managing which WTPs
are authorized to provide service are traditionally handled by
proprietary solutions.  Allowing these functions to be performed from
a centralized AC in an interoperable fashion increases manageability
and allows network operators to more tightly control their wireless
network infrastructure.

1.1.  Goals

The goals for the CAPWAP protocol are listed below:

1. To centralize the authentication and policy enforcement functions
   for a wireless network.  The AC may also provide centralized
   bridging, forwarding, and encryption of user traffic.
   Centralization of these functions will enable reduced cost and
   higher efficiency by applying the capabilities of network
   processing silicon to the wireless network, as in wired LANs.

2. To enable shifting of the higher-level protocol processing from
   the WTP.  This leaves the time-critical applications of wireless
   control and access in the WTP, making efficient use of the
   computing power available in WTPs, which are subject to severe
   cost pressure.
```

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 8.

44.    The '531 Accused Products include a negotiation unit for the single or plurality of WPs to dynamically negotiate with the control node for a secure connection and function split arrangement.  For example, through the discovery process, NXP APs convey their capabilities to an AC, which will utilize this information to configure the network and establish a secure DTLS session.

> The CAPWAP Protocol begins with a Discovery phase.  The WTPs send a
> Discovery Request message, causing any Access Controller (AC)
> receiving the message to respond with a Discovery Response message.
> From the Discovery Response messages received, a WTP selects an AC
> with which to establish a secure DTLS session.  In order to establish
> the secure DTLS connection, the WTP will need some amount of pre-
> provisioning, which is specified in Section 12.5.  CAPWAP protocol
> messages will be fragmented to the maximum length discovered to be
> supported by the network.

> Once the WTP and the AC have completed DTLS session establishment, a
> configuration exchange occurs in which both devices agree on version
> information.  During this exchange, the WTP may receive provisioning
> settings.  The WTP is then enabled for operation.

45.    Furthermore, through the discovery process, NXP APs convey their capabilities to an AC, which will utilize this information to configure a network.

> **8.1.1**.  **Configuration Flexibility**
>
>    The CAPWAP protocol provides the flexibility to configure and manage
>    WTPs of varying design and functional characteristics.  When a WTP
>    first discovers an AC, it provides primary functional information
>
>
>
> Calhoun, et al.               Standards Track               [Page 113]
>
> RFC 5415               CAPWAP Protocol Specification           March 2009
>
>
>    relating to its type of MAC and to the nature of frames to be
>    exchanged.  The AC configures the WTP appropriately.  The AC also
>    establishes corresponding internal state for the WTP.

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 113.

46.    Through the discovery process, NXP APs convey their capabilities to an AC, which will utilize this information to configure the network. For example,

the network may be set up with one of two modes of encapsulation: 802.3 and

native wireless.

```
4.4.2.  Data Payload

   A CAPWAP protocol Data Payload packet encapsulates a forwarded
   wireless frame.  The CAPWAP protocol defines two different modes of
   encapsulation: IEEE 802.3 and native wireless.  IEEE 802.3
   encapsulation requires that for 802.11 frames, the 802.11
   *Integration* function be performed in the WTP.  An IEEE 802.3-
   encapsulated user payload frame has the following format:

       +-----------------------------------------------------+
       | IP Header | UDP Header | CAPWAP Header | 802.3 Frame |
       +-----------------------------------------------------+

   The CAPWAP protocol also defines the native wireless encapsulation
   mode.  The format of the encapsulated CAPWAP Data frame is subject to
   the rules defined by the specific wireless technology binding.  Each
   wireless technology binding MUST contain a section entitled "Payload
   Encapsulation", which defines the format of the wireless payload that
   is encapsulated within CAPWAP Data packets.

   For 802.3 payload frames, the 802.3 frame is encapsulated (excluding
   the IEEE 802.3 Preamble, Start Frame Delimiter (SFD), and Frame Check
   Sequence (FCS) fields).  If the encapsulated frame would exceed the
   transport layer's MTU, the sender is responsible for the
   fragmentation of the frame, as specified in Section 3.4.  The CAPWAP
   protocol can support IEEE 802.3 frames whose length is defined in the
   IEEE 802.3as specification [FRAME-EXT].
```

```
   CAPWAP assumes a network configuration consisting of multiple WTPs
   communicating via the Internet Protocol (IP) to an AC.  WTPs are
   viewed as remote radio frequency (RF) interfaces controlled by the
   AC.  The CAPWAP protocol supports two modes of operation: Split and
   Local MAC (medium access control).  In Split MAC mode, all L2
   wireless data and management frames are encapsulated via the CAPWAP
   protocol and exchanged between the AC and the WTP. As shown in
   Figure 1, the wireless frames received from a mobile device, which is
   referred to in this specification as a Station (STA), are directly
   encapsulated by the WTP and forwarded to the AC.
```

> The Local MAC mode of operation allows for the data frames to be either locally bridged or tunneled as 802.3 frames.  The latter implies that the WTP performs the 802.11 Integration function.  In either case, the L2 wireless management frames are processed locally

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at pp. 7, 52.

47.    The control node of the '531 Accused Products negotiates with the single or plurality of WAPs using the negotiation unit and provides complementary functionality for the single or plurality of each of the WAPs to form a complete functionality defined for the wireless local area network according to a decision of the negotiation unit.

48.    For example, the AC provides complimentary functionality for the APs by, for example, performing the 802.11 integration function, if split MAC mode is utilized. The final configuration decision is made by the negotiation unit on the AC.

> **8.3.  Configuration Status Response**
>
> **The Configuration Status Response message is sent by an AC and provides a mechanism for the AC to override a WTP's requested configuration.**

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 115.

**NXP INFRINGES U.S. PATENT NUMBER 8,270,384.**

49.    The Patent Office issued U.S. Patent No. 8,270,384, titled "Wireless Point that Provides Functions For a Wireless Local Area Network To Be Separated

Between the Wireless Point and One or More Control Nodes, and Method For
Providing Service In a Wireless Local Area Network Having Functions Separated
Between a Wireless Point and One or More Control Nodes" on  September 18,
2012, after a thorough examination and determination that the subject matter
claimed is patentable.

50.    Claim 1 of the '384 patent recites:

A wireless point that provides for functions for a wireless local area
network to be separated between said wireless point and one or more control
nodes, said wireless point comprising:

a discovery unit configured to send a discovery request message to
said one or more control nodes;

a selecting unit configured to select one control node of said one or
more control nodes based on one or more discovery response messages sent
to said wireless point from said one or more control nodes in response to
said discovery request message, each of said one or more discovery response
messages including information of functions offered by the associated
control node of said one or more control nodes;

a session establishing unit configured to establish a secure session
with said selected one control node; and

a negotiation unit configured to exchange information about the

functions to be separated between said selected one control node and said wireless point.

51.    The NXP devices that infringed the '384 patent include at least the NXP Access Point Systems that support configuration using the CAPWAP protocol to provide service in a WLAN.  Example infringing products include at least the following NXP product codes: RDT1023WLAN and products providing the same or similar functionality ("'384 Accused Products").

52.    The '384 Accused Products include a wireless point that provides for functions for a wireless local area network to be separated between said wireless point and one or more control nodes.

53.    For example, NXP Access Point Systems support configuration using the CAPWAP protocol to provide service in a WLAN. The NXP QorIQ SOC can be used in the AC or WAP case for CAPWAP functional divisions. The T1023 WLAN AP is a wireless point.



https://www.nxp.com/design/design-center/development-boards-and-designs/t1023-wlan-access-point-system:RDT1023WLAN.

This demo will provide three modes to show the CAPWAP offloading capability of QorIQ platform. mode Iis the core-through mode which can be implemented by the CAPWAP stack to send the CAPWAP stack packets; Mode II is the offloading-mode which demonstrates the CAPWAP Encapsulation/De-capsulation capability of the SoC, and can be used in the AC case; Mode III is the net-bridge mode which is the basic usage for EAP which bridge the packets from PCIE to SEC and FM for offloading CAPWAP manipulation, the bridge is zero-memory copy in order to get high performance data. Together with the throughput data, this demo will help the customer to evaluate the EAP design with QorIQ platform.

https://community.nxp.com/t5/NXP-Designs-Knowledge-Base/Secure-Tunnel-Offload-from-WLAN-AP-to-Switch/ta-p/1104046.



https://community.nxp.com/pwmxy87654/attachments/pwmxy87654/connects/94/1/AMF-NET-T2678.pdf.

54.    NXP APs and ACs support configuration, using the CAPWAP

protocol, to separate WLAN functions between them.

```
This document describes the CAPWAP protocol, a standard,
interoperable protocol that enables an Access Controller (AC) to
manage a collection of Wireless Termination Points (WTPs).  The
CAPWAP protocol is defined to be independent of Layer 2 (L2)
technology, and meets the objectives in "Objectives for Control and
Provisioning of Wireless Access Points (CAPWAP)" [RFC4564].
```

```
    Provisioning WTPs with security credentials and managing which WTPs
    are authorized to provide service are traditionally handled by
    proprietary solutions.  Allowing these functions to be performed from
    a centralized AC in an interoperable fashion increases manageability
    and allows network operators to more tightly control their wireless
    network infrastructure.

1.1.  Goals

    The goals for the CAPWAP protocol are listed below:

    1. To centralize the authentication and policy enforcement functions
       for a wireless network.  The AC may also provide centralized
       bridging, forwarding, and encryption of user traffic.
       Centralization of these functions will enable reduced cost and
       higher efficiency by applying the capabilities of network
       processing silicon to the wireless network, as in wired LANs.

    2. To enable shifting of the higher-level protocol processing from
       the WTP.  This leaves the time-critical applications of wireless
       control and access in the WTP, making efficient use of the
       computing power available in WTPs, which are subject to severe
       cost pressure.
```

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at pp. 1, 8.

     55.    The '384 Accused Products include a discovery unit configured to send a discovery request message to said one or more control nodes. For example, NXP APs send discovery requests to the one or more ACs in the network.

```
The CAPWAP Protocol begins with a Discovery phase.  The WTPs send a
Discovery Request message, causing any Access Controller (AC)
receiving the message to respond with a Discovery Response message.
From the Discovery Response messages received, a WTP selects an AC
with which to establish a secure DTLS session.  In order to establish
the secure DTLS connection, the WTP will need some amount of pre-
provisioning, which is specified in Section 12.5.  CAPWAP protocol
messages will be fragmented to the maximum length discovered to be
supported by the network.
```

```
Discovery Thread:   The AC's Discovery thread is responsible for
   receiving, and responding to, Discovery Request messages.  The
   state machine transitions in Figure 4 are represented by numerals.
   Note that the Discovery thread does not maintain any per-WTP-
   specific context information, and a single state context exists.
   It is necessary for the AC to protect itself against various
   attacks that exist with non-authenticated frames.  See Section 12
   for more information.
```

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at pp. 11, 17.

56.    The '384 Accused Products include a selecting unit configured to select one control node of said one or more control nodes based on one or more discovery response messages sent to said wireless point from said one or more control nodes in response to said discovery request message, each of said one or more discovery response messages including information of functions offered by the associated control node of said one or more control nodes.

57.    For example, NXP APs select an AC based on the discovery response message received, through which the AC advertises its services.

```
Upon receiving a Discovery Request message, the AC will respond with
a Discovery Response message sent to the address in the source
address of the received Discovery Request message.  Once a Discovery
Response has been received, if the WTP decides to establish a session
with the responding AC, it SHOULD perform an MTU discovery, using the
process described in Section 3.5.
```

```
5.2.  Discovery Response Message

   The Discovery Response message provides a mechanism for an AC to
   advertise its services to requesting WTPs.

   When a WTP receives a Discovery Response message, it MUST wait for an
   interval not less than DiscoveryInterval for receipt of additional
   Discovery Response messages.  After the DiscoveryInterval elapses,
   the WTP enters the DTLS-Init state and selects one of the ACs that
   sent a Discovery Response message and send a DTLS Handshake to that
   AC.
```

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at pp. 104, 105.

58.     The '384 Accused Products include a session establishing unit configured to establish a secure session with said selected one control node.  For example, the AP established a secure DTLS session with the chosen AC.

```
The CAPWAP Protocol begins with a Discovery phase.  The WTPs send a
Discovery Request message, causing any Access Controller (AC)
receiving the message to respond with a Discovery Response message.
From the Discovery Response messages received, a WTP selects an AC
with which to establish a secure DTLS session.  In order to establish
the secure DTLS connection, the WTP will need some amount of pre-
provisioning, which is specified in Section 12.5.  CAPWAP protocol
messages will be fragmented to the maximum length discovered to be
supported by the network.
```

```
Once the WTP and the AC have completed DTLS session establishment, a
configuration exchange occurs in which both devices agree on version
information.  During this exchange, the WTP may receive provisioning
settings.  The WTP is then enabled for operation.
```

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at pp. 11, 12.

59.     The '384 Accused Products include a negotiation unit configured to exchange information about the functions to be separated between said selected

one control node and said wireless point.

60.    For example, NXP APs contain a negotiation unit that sends functional information to the AC.

> **8.1.1.  Configuration Flexibility**
>
> The CAPWAP protocol provides the flexibility to configure and manage
> WTPs of varying design and functional characteristics.  When a WTP
> first discovers an AC, it provides primary functional information
>
>
>
> Calhoun, et al.               Standards Track              [Page 113]
>
> RFC 5415               CAPWAP Protocol Specification        March 2009
>
>
> relating to its type of MAC and to the nature of frames to be
> exchanged.  The AC configures the WTP appropriately.  The AC also
> establishes corresponding internal state for the WTP.

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 133.

61.    NXP APs include a negotiation unit that sends functional information to the AC.  For example, functions may be split using two modes of operation: Split MAC and Local MAC.  Functions may also be split using two modes of encapsulation: 802.3 and native wireless.

CAPWAP assumes a network configuration consisting of multiple WTPs
communicating via the Internet Protocol (IP) to an AC.  WTPs are
viewed as remote radio frequency (RF) interfaces controlled by the
AC.  The CAPWAP protocol supports two modes of operation: Split and
Local MAC (medium access control).  In Split MAC mode, all L2
wireless data and management frames are encapsulated via the CAPWAP
protocol and exchanged between the AC and the WTP.  As shown in
Figure 1, the wireless frames received from a mobile device, which is
referred to in this specification as a Station (STA), are directly
encapsulated by the WTP and forwarded to the AC.



```
        +-+        wireless frames        +-+
        | |-------------------------------| |
        | |                +-+            | |
        | |--------------| |---------------| |
        | |wireless PHY/ | |    CAPWAP     | |
        | | MAC sublayer | |               | |
        +-+              +-+              +-+
        STA             WTP              AC
```

     Figure 1: Representative CAPWAP Architecture for Split MAC

The Local MAC mode of operation allows for the data frames to be
either locally bridged or tunneled as 802.3 frames.  The latter
implies that the WTP performs the 802.11 Integration function.  In
either case, the L2 wireless management frames are processed locally

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 7.

```
4.4.2.  Data Payload

  A CAPWAP protocol Data Payload packet encapsulates a forwarded
  wireless frame.  The CAPWAP protocol defines two different modes of
  encapsulation: IEEE 802.3 and native wireless.  IEEE 802.3
  encapsulation requires that for 802.11 frames, the 802.11
  *Integration* function be performed in the WTP.  An IEEE 802.3-
  encapsulated user payload frame has the following format:

      +-----------------------------------------------------+
      | IP Header | UDP Header | CAPWAP Header | 802.3 Frame |
      +-----------------------------------------------------+

  The CAPWAP protocol also defines the native wireless encapsulation
  mode.  The format of the encapsulated CAPWAP Data frame is subject to
  the rules defined by the specific wireless technology binding.  Each
  wireless technology binding MUST contain a section entitled "Payload
  Encapsulation", which defines the format of the wireless payload that
  is encapsulated within CAPWAP Data packets.

  For 802.3 payload frames, the 802.3 frame is encapsulated (excluding
  the IEEE 802.3 Preamble, Start Frame Delimiter (SFD), and Frame Check
  Sequence (FCS) fields).  If the encapsulated frame would exceed the
  transport layer's MTU, the sender is responsible for the
  fragmentation of the frame, as specified in Section 3.4.  The CAPWAP
  protocol can support IEEE 802.3 frames whose length is defined in the
  IEEE 802.3as specification [FRAME-EXT].
```

RFC 5415 (03/2009), https://datatracker.ietf.org/doc/html/rfc5415 at p. 52.

## NXP INFRINGES U.S. PATENT NUMBER 8,552,684.

62.    The Patent Office issued U.S. Patent No. 8,552,684 titled "Non-

Contact Charging Module and Reception-Side and Transmission-Side Non-Contact

Charging Apparatuses Using the Same" on October 8, 2013 after a thorough

examination and determination that the subject matter claimed is patentable.

63.    Claim 12 of the '684 patent recites:

A transmission-side non-contact charging module that transmits

power to a reception-side non-contact charging module that comprises a first

hole by an electromagnetic induction and that is allowed to align with the reception-side non-contact charging module in either a first case or a second case, the first case being a case where a magnet included within the first hole in the reception-side non-contact charging module is used when alignment with the reception-side non-contact charging module is performed, the second case being a case where the magnet is not within the first hole and thereby not used when the alignment is performed, the transmission-side non-contact charging module comprising:

a planar coil portion in which a conducting wire is wound and that comprises a second hole of a predetermined size, the second hole being provided within an inner winding of the planar coil portion; and

a ferrite sheet on which a coil surface of the planar coil portion is placed and that faces the coil surface of the planar coil portion and that attracts, in the case where the magnet is used when the alignment with the reception-side non-contact charging module is performed, the magnet of the reception-side non-contact charging module,

wherein the predetermined size of the second hole is larger than a size of the magnet included in the reception-side non-contact charging module, and

wherein the predetermined size of the second hole is greater than 15.5

mm.

64.    The NXP devices that infringe the '684 patent include wireless charging transmitters that are enabled for wireless charging according to the Qi wireless charging specification, and other similar wireless charging transmitters. Example NXP product numbers include the WCT-15W1CFFPD, RDWCT-5WTXAUTO, WCT-15WAUTO, RDWCT-15WTXAUTO, WCT-15WTXAUTOS, and WCT-15WAUTOS2 ("'684 Accused Products).

*See e.g.,* https://www.nxp.com/design/design-center/development-boards-and-designs:EVDEBRDSSYS?collection=devBoardsDesigns&start=0&max=12&language=en&keyword=WCT&depth=2.



https://www.nxp.com/design/design-center/development-boards-and-designs/mp-a11-fixed-frequency-transmitter-22-watt-capability-reference-design:WCT-15W1CFFPD.



https://www.nxp.com/design/design-center/development-boards-and-designs/5-w-multi-coil-wireless-charging-transmitter:RDWCT-5WTXAUTO.



https://www.nxp.com/design/design-center/development-boards-and-designs/automotive-15w-wireless-charging-transmitter:WCT-15WAUTO13.

65.    The '684 Accused Products include a transmission-side non-contact charging module that transmits power to a reception-side non-contact charging module that comprises a first hole by an electromagnetic induction and that is

allowed to align with the reception-side non-contact charging module in either a first case or a second case, the first case being a case where a magnet included within the first hole in the reception-side non-contact charging module is used when alignment with the reception-side non-contact charging module is performed, the second case being a case where the magnet is not within the first hole and thereby not used when the alignment is performed.

66.    For example, each of the '684 Accused Products is a transmission-side non-contact charging module (*e.g.*, a wireless charger).



https://www.nxp.com/docs/en/fact-sheet/WCT15W1CFFPDQIFS.pdf.

67.    Each of the '684 Accused Products transmits power to a reception-side non-contact charging module (*e.g.*, a Qi compatible device).





https://www.nxp.com/design/design-center/development-boards-and-designs/mp-a11-fixed-frequency-transmitter-22-watt-capability-reference-design:WCT-15W1CFFPD.

68.    Each of the '684 Accused Products transmits power to a reception-side non-contact charging module via electromagnetic induction.



WPC - Introduction to the Power Class 0 Specification v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-introduction-v1.2.3.pdf at p. 9).

69.    A reception-side non-contact charging module comprises a first hole at the interior edge of the secondary coil.



WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at p. 320).

70.    Each of the '584 Accused Products is allowed to align with a reception-side non-contact charging module.



Figure 6. Qi wireless power transfer using magnetic induction

## 4.3  Charging area

The power transfer system in the Power Class 0 specification is based on a single coil in the power transmitter that has an outer diameter of 50 mm (2 in), and a coil in the power receiver that has an outer diameter of 40 mm (1.6 in). Actual power transmitter and power receiver implementations may deviate from these dimensions, as long as they are able to pass all relevant Qi compliance tests.

In a typical use case, a mobile device is positioned on the top surface of a charger with the power transmitter coil and the power receiver coil aligned. Ideally, the coils should be perfectly aligned for maximum power transfer, but misaligning the coils by several millimeters mm (about ¼ inch) should not be a problem.

### 4.4    Coupling requirements

Coupling occurs when current changes in one coil creates a voltage in the other coil via magnetic induction. Coupling is highest—with the most efficient power transfer—when:

- the PTx and PRx use exactly the same coil

- the PTx and PRx are perfectly aligned

- the distance between the coils is small (less than the diameter of the coils)

- the coils are externally shielded by ferrite

Conditions that decrease coupling (and power transfer efficiency) include different power transmitter/power receiver coil sizes and shapes, coil misalignment, excessive distance between coils, and the presence of foreign objects on the power transmitter.

WPC - Introduction to the Power Class 0 Specification v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-introduction-v1.2.3.pdf at pp. 9, 11, 12).

71.    Each of the Accused Products is allowed to align with a reception-side non-contact charging module in a case where there is a magnetic attractor (*e.g.*, "a magnet") in the first hole for aligning the reception-side non-contact charging module with the transmission-side non-contact charging module.



Figure 229. Secondary Coil and Shielding assembly of Power Receiver example 2

WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at p. 320).

72.    Each of the '684 Accused Products includes a planar coil portion in which a conducting wire is wound and that comprises a second hole of a predetermined size, the second hole being provided within an inner winding of the planar coil portion.

73.    For example, the second hole is provided within an inner winding of the transmission-side non-contact charging module's planar coil portion.



**2.1. Package contents**

1.  WCT Consumer MP-A11 (WCT-15W1CFFPD) demo board.

Figure 1.  MP-A11 (WCT-15W1CFFPD) demo board

https://www.nxp.com/docs/en/user-guide/WCT101XV10AUG.pdf at p. 2.

74.    Each of the '684 Accused Products includes a ferrite sheet on which a coil surface of the planar coil portion is placed and that faces the coil surface of the planar coil portion and that attracts, in the case where the magnet is used when the alignment with the reception-side non-contact charging module is performed, the magnet of the reception-side non-contact charging module.

75.    For example, the NXP Wireless Charging Accused Product's non-contact charging module includes a magnetic sheet on which the planar coil is placed.



WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-

web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at p. 24).



**2.1.  Package contents**

    1.  WCT Consumer MP-A11 (WCT-15W1CFFPD) demo board.

Figure 1.  MP-A11 (WCT-15W1CFFPD) demo board

https://www.nxp.com/docs/en/user-guide/WCT101XV10AUG.pdf at p. 2.

    76.    For each of the '684 Accused Products, the predetermined size of the second hole is larger than a size of the magnet included in the reception-side non-contact charging module, and the predetermined size of the second hole is greater than 15.5 mm.

    77.    For example, the diameter of the second hole is larger than the diameter of any Qi-specified magnet included in any Qi-specified reception-side

non-contact charging modules and is also greater than 15.5mm.

| Power Receiver Example # | Magnet Diameter |
|---|---|
| Power Receiver Example 1 | 15 mm |
| Power Receiver Example 2 | 10 mm |
| Power Receiver Example 3 | 20 mm |
| Power Receiver Example 4 | 20 mm |
| Power Receiver Example 5 | 0 mm |

WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at pp. 316, 320, 323, 326, 330 (Summarized)).



### 2.1.  Package contents

1.  WCT Consumer MP-A11 (WCT-15W1CFFPD) demo board.

**Figure 1.  MP-A11 (WCT-15W1CFFPD) demo board**

https://www.nxp.com/docs/en/user-guide/WCT101XV10AUG.pdf at p. 2.

**NXP INFRINGES U.S. PATENT NUMBER 8,963,490.**

78.    The Patent Office issued U.S. Patent No. 8,963,490, titled "Non-Contact Charging Module and Reception-Side and Transmission-Side Non-Contact Charging Apparatuses Using the Same" on February 24, 2015, after a thorough examination and determination that the subject matter claimed is patentable.

79.    Claim 1 of the '490 patent recites:

A non-contact charging module that performs power transmission with another non-contact charging module, the non-contact charging module comprising:

a planar coil in which a conducting wire is wound and which comprises a hollow portion being provided within an inner winding of the planar coil ; and

a magnetic sheet on which the planar coil portion is placed, wherein a size of the hollow portion of the planar coil is greater than 15.5 mm; and

wherein the non-contact charging module is allowed to align with an another non-contact charging module that comprises a first hole in either a first case or a second case, the first case being a case where a magnet included within the first hole in the other non-contact charging module is used when alignment with the other non-contact charging module is

performed or, the second case being a case where the magnet is not within the first hole and thereby not used when the alignment is performed.

80.    The NXP devices that infringe the '490 patent include wireless charging transmitters that are enabled for wireless charging according to the Qi wireless charging specification, and other similar wireless charging transmitters. Example NXP product numbers include the WCT-15W1CFFPD, RDWCT-5WTXAUTO, WCT-15WAUTO, RDWCT-15WTXAUTO, WCT-15WTXAUTOS, and WCT-15WAUTOS2 ("'490 Accused Products).

*See e.g.,* https://www.nxp.com/design/design-center/development-boards-and-designs:EVDEBRDSSYS?collection=devBoardsDesigns&start=0&max=12&language=en&keyword=WCT&depth=2.



https://www.nxp.com/design/design-center/development-boards-and-designs/mp-a11-fixed-frequency-transmitter-22-watt-capability-reference-design:WCT-15W1CFFPD.



https://www.nxp.com/design/design-center/development-boards-and-designs/5-w-multi-coil-wireless-charging-transmitter:RDWCT-5WTXAUTO.



https://www.nxp.com/design/design-center/development-boards-and-designs/automotive-15w-wireless-charging-transmitter:WCT-15WAUTO13.

81.    The '490 Accused Products include a non-contact charging module that performs power transmission with another non-contact charging module.

82.    For example, the NXP Wireless Charging Accused Product supports

wireless charging according to the Qi wireless charging standard. Accordingly, the NXP Wireless Charging Accused Product includes a power transmitter module (PTx) (*e.g.*, "non-contact charging module").



Figure 6. Electrical diagram (outline) of Power Transmitter design A2

WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at p. 25).

## 2.1.  Package contents

1.  WCT Consumer MP-A11 (WCT-15W1CFFPD) demo board.



**Figure 1.  MP-A11 (WCT-15W1CFFPD) demo board**

https://www.nxp.com/docs/en/user-guide/WCT101XV10AUG.pdf at p. 2.

83.    The Qi standard requires charging via magnetic induction with another non-contact charging module. The non-contact charging module of claim 1 may be in a PRx or PTx device.



WPC - Introduction to the Power Class 0 Specification v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-introduction-v1.2.3.pdf at p. 9).

84.    Each of the '684 Accused Products includes a planar coil in which a conducting wire is wound and which comprises a hollow portion being provided within an inner winding of the planar coil.

85.    For example, a planar coil of the '490 Accused Products has a

conducting wire wound to comprise a hollow portion.



**2.1.  Package contents**

1.  WCT Consumer MP-A11 (WCT-15W1CFFPD) demo board.

**Figure 1.  MP-A11 (WCT-15W1CFFPD) demo board**

https://www.nxp.com/docs/en/user-guide/WCT101XV10AUG.pdf at p. 2.

86.    Each of the '490 Accused Products includes a magnetic sheet on

which the planar coil portion is placed, wherein a size of the hollow portion of the

planar coil is greater than 15.5 mm.

87.    For example, the '690 Accused Products includes a non-contact

charging module includes a magnetic sheet on which the planar coil is placed.  The

diameter of the hollow portion is greater than 15.5 mm.



**2.1. Package contents**

1. WCT Consumer MP-A11 (WCT-15W1CFFPD) demo board.

Figure 1.  MP-A11 (WCT-15W1CFFPD) demo board

https://www.nxp.com/docs/en/user-guide/WCT101XV10AUG.pdf at p. 2.



2.2.2.1.2    Shielding

As shown in Figure 5, Shielding protects the Base Station from the magnetic field that is generated in the Primary Coil. The Shielding should be Ni-Zn or Mn-Zn ferrite and should be at least 0.2 mm thick. The Shielding extends to at least 2 mm beyond the outer diameter of the Primary Coil, and is placed below the Primary Coil at a distance of at most $d_s = 0.1$ mm.

Figure 5. Primary Coil assembly of Power Transmitter design A2

WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at p. 24).



**Figure 32. Primary Coil of Power Transmitter design A11**

**Table 21. Primary Coil parameters of Power Transmitter design A11**

| Parameter | Symbol | Value |
|---|---|---|
| Outer diameter | $d_o$ | $44^{\pm 1.5}$ mm |
| Inner diameter | $d_i$ | $20.5^{\pm 0.5}$ mm |
| Thickness | $d_c$ | $2.1^{+0.5}$ mm |
| Number of turns per layer | $N$ | 10 (5 bifilar turns) |
| Number of layers | – | 1 or 2 |

WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at p. 61).

88.    The non-contact charging module of the '460 Accused Products is allowed to align with an another non-contact charging module that comprises a first hole in either a first case or a second case, the first case being a case where a

magnet included within the first hole in the other non-contact charging module is used when alignment with the other non-contact charging module is performed or, the second case being a case where the magnet is not within the first hole and thereby not used when the alignment is performed.

89. For example, the non-contact charging module of the '460 Accused Products is structured to align with a counterpart non-contact charging module (*e.g.*, a Qi power receiver).



## 4.3    Charging area

The power transfer system in the Power Class 0 specification is based on a single coil in the power transmitter that has an outer diameter of 50 mm (2 in), and a coil in the power receiver that has an outer diameter of 40 mm (1.6 in). Actual power transmitter and power receiver implementations may deviate from these dimensions, as long as they are able to pass all relevant Qi compliance tests.

In a typical use case, a mobile device is positioned on the top surface of a charger with the power transmitter coil and the power receiver coil aligned. Ideally, the coils should be perfectly aligned for maximum power transfer, but misaligning the coils by several millimeters mm (about ¼ inch) should not be a problem.

## 4.4    Coupling requirements

Coupling occurs when current changes in one coil creates a voltage in the other coil via magnetic induction. Coupling is highest—with the most efficient power transfer—when:

▪ the PTx and PRx use exactly the same coil

▪ the PTx and PRx are perfectly aligned

▪ the distance between the coils is small (less than the diameter of the coils)

▪ the coils are externally shielded by ferrite

Conditions that decrease coupling (and power transfer efficiency) include different power transmitter/power receiver coil sizes and shapes, coil misalignment, excessive distance between coils, and the presence of foreign objects on the power transmitter.

WPC - Introduction to the Power Class 0 Specification v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-introduction-v1.2.3.pdf at pp. 9, 11, 12).

90.    The Qi specification defines multiple power receiver designs intended to receive power from Qi transmitters, such as the non-contact charging module in the NXP Wireless Charging Accused Products.  In the case of power receiver example 4, a magnet is included in the first hole.  In the case of power receiver example 5, a magnet is not included in the first hole.

#### 3.4.1.2     Shielding

As shown in Figure 235, Power Receiver example 4 employs Shielding. The Shielding should be Ni-Zn or Mn-Zn ferrite and should be $d_s = 1.0^{\pm 0.25}$ mm thick. The Shielding has a size of $d_{os} = 50^{\pm 0.25}$ mm, and is centered directly on the top face of the Secondary Coil.

**Figure 235. Secondary Coil and Shielding assembly of Power Receiver example 4**



#### 3.5.1.2     Shielding

As shown in Figure 238, Power Receiver example 5 employs Shielding. The Shielding should be Ni-Zn or Mn-Zn ferrite and should be $0.6^{\pm 0.25}$ mm thick. The Shielding has a size of $d_l \times d_w = 50.0^{\pm 0.25} \times 50.0^{\pm 0.25}$ mm² and is centered directly on the top face of the Secondary Coil.

**Figure 238. Secondary Coil and Shielding assembly of Power Receiver example 5**



WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Part 4: Reference Designs v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part4-v1.2.3.pdf at pp. 326, 330).

### NXP INFRINGES U.S. PATENT NUMBER 9,620,282.

91.    The Patent Office issued U.S. Patent No. 9,620,282 titled "Noncontact Connector Apparatus and System Using Inductive Coupling Between Coils" on April 11, 2017, after a thorough examination and determination that the subject matter claimed is patentable.

92.    Claim 10 of the '282 patent recites:

A power transfer apparatus comprising:

A power receiver circuit; and

A noncontact connector apparatus connected to the power receiver circuit,

Wherein the noncontact connector apparatus comprises a receiver coil that is provided to be adjacent, so as to be electromagnetically coupled, to a transmitter coil,

The receiver coil is configured to include a winding wound on a second plane that is opposed to be adjacent to the first plane on which the transmitter coil is provided and

The noncontact connector apparatus comprises:

a second magnetic body provided between the first plane and the second plane, the second magnetic body being provided to be adjacent , so as to be electromagnetically coupled, to the receiver coil and to cover at least

one part of a region in which at least the winding of the receiver coil exists, and

a coupling coefficient between the transmitter coil and the receiver coil is set to be decreased by increasing the self-inductance of each of the transmitter coil and the receiver coil so that a frequency characteristic of transmission efficiency from the transmitter coil to the receiver coil changes from a double-peaked narrow-band characteristic to a single-peaked wide-band characteristic, and

a center frequency of the double-peaked narrow-band characteristic is lower than a center frequency of the single peaked wide-band characteristic.

93.    The NXP products that infringe the '282 patent include wireless charging receivers that charge according to the Qi wireless charging specification. Example products include WRP1500-HV and WRP1500HVMPP and products that provide the same or similar functionality ("'282 Accused Products).

*See* https://www.nxp.com/design/design-center/development-boards-and-designs/high-voltage-wireless-charging-receiver:WPR1500-HV; https://www.nxp.com/design/design-center/development-boards-and-designs/high-voltage-mpp-wireless-charging-receiver:WPR1500-HVMPP

94.    NXP is a Wireless Power Consortium (WPC) member company, the WPC promulgates the WPC/Qi wireless charging specification.



https://www.wirelesspowerconsortium.com/membership-directory-bak/#N

95.    The '282 Accused Products are each a power transfer apparatus.  For example, the NXP WPR1500-HV High Voltage Wireless Charging Receiver is enabled for wireless charging, including, wireless charging according to the Qi wireless charging specification. The NXP WPR1500-HV High Voltage Wireless Charging Receiver is a power transfer apparatus because it transfers power via its wireless charging capability.



https://www.nxp.com/design/design-center/development-boards-and-designs/high-voltage-wireless-charging-receiver:WPR1500-HV.

96.    The '282 Accused Products include a power receiver circuit.  For

example, the NXP WPR1500-HV supports wireless charging according to the Qi

wireless charging standard. Accordingly, the NXP WPR1500-HV includes a power receiver circuit (PRx).



https://www.nxp.com/design/design-center/development-boards-and-designs/high-voltage-wireless-charging-receiver:WPR1500-HV.



Figure 4. WPR1500-HV receiver board modules overview

https://www.nxp.com/docs/en/user-guide/WPR1500HVWCRAUG.pdf at p. 3.



## 3.1    Power Receiver design requirements (PRx)

Figure 4 illustrates an example of a functional block diagram for a Baseline Power Profile Power Receiver.

**Figure 4. Functional block diagram for a Baseline Power Profile Power Receiver**

WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Parts 1 and 2: Interface Definitions v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part1&2-v1.2.3a.pdf at p. 24).

97.    The '282 Accused Products include a noncontact connector apparatus connected to the powe3r receiver circuit. For example, NXP WPR1500-HV wireless charging module is an example of a noncontact connector apparatus. The NXP WPR1500-HV wireless charging module is connected to its power receiving

circuit (PRx) via contact area.



https://www.nxp.com/docs/en/user-guide/WPR1500HVWCRAUG.pdf at p. 3.



https://www.nxp.com/design/design-center/development-boards-and-designs/high-voltage-wireless-charging-receiver:WPR1500-HV.

98.    The noncontact connector apparatus of each of the '282 Accused Products includes a receiver coil that is provided to be adjacent, so as to be electromagnetically coupled to a transmitter coil.



## Product Details

Features | Applications

**Features**

- Compliant with the EPP WPC Qi V1.3x specification, compatible with V1.2.4
- Input voltage (3.5 V – 20 V AC peak) from the transmitter through the receiver coil
- Output voltage range can be set from 3.5 V to 20 V
- Default output power 15 W(12 V@1.25 A), can be extended up to 30 W(20 V@1.5 A)
- Hardware protection of rectifier voltage, output voltage and output current
- Software based solution to provide maximum design freedom and product differentiation
- Enhanced EMC performance
- Power transfer efficiency exceeds 80%

https://www.nxp.com/design/design-center/development-boards-and-designs/high-

voltage-wireless-charging-receiver:WPR1500-HV.

99.    In compliance with Qi charging requirements, the NXP WPR1500-HV receiver coil is provided so that it is adjacent so as to be electronically coupled to a transmitter coil.



WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Parts 1 and 2: Interface Definitions v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part1&2-v1.2.3a.pdf at p. 22).



Figure 2.  Wireless Charging System Overview

https://www.nxp.com/docs/en/user-guide/WPR1500HVWCRAUG.pdf at p. 2.

## 3    How Qi wireless power transfer works

The Qi wireless power transfer system uses magnetic induction to transfer power to a power receiver (PRx) subsystem contained within the mobile device when it is placed on top of a power transmitter (PTx).

WPC - Introduction to the Power Class 0 Specification v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-introduction-v1.2.3.pdf at pp. 8, 9).

100.   The receiver coil in the '282 Accused Products is configured to include a winding wound on a second plane that is opposed to be adjacent to the first plane on which the transmitter coil is provided.  For example, the NXP WPR1500-HV receiver coil includes a winding wound on a second plane opposed to be adjacent to a first plane on which the transmitter coil is provided.

A critical feature of the magnetic field is that it can transfer through any non-metallic, non-ferrous materials, such as plastics, glass, water, wood, and air. In other words, wires and connectors are not needed between the power transmitter and power receiver.



WPC - Introduction to the Power Class 0 Specification v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-introduction-v1.2.3.pdf at p. 9).

101.  The noncontact connector apparatus of the '282 Accused Products includes a second magnetic body provided between the first plane and the second plane, the second magnetic body being provided to be adjacent, so as to be electromagnetically coupled, to the receiver coil and to cover at least one part of a region in which at least the winding of the receiver coil exists.

102.    For example, the wireless charging module of the NXP WPR1500-HV comprises shielding material (an insulating sheet, "a second magnetic body"). The insulating sheet is adjacent and electromagnetically coupled to the WPR1500-HV receiving coil, and it covers at least part of the coil winding. One side (*e.g.*, the bottom-facing side) of the insulating sheet is provided between the second plane (on which the Rx coil is wound) and the first plane (on which the Tx coil is provided).



https://www.nxp.com/design/design-center/development-boards-and-designs/high-voltage-wireless-charging-receiver:WPR1500-HV.

103.    A coupling coefficient between the transmitter coil and the receiver

coil in the '282 Accused Products is set to be decreased by increasing the self-inductance of each of the transmitter coil and the receiver coil so that a frequency characteristic of transmission efficiency from the transmitter coil to the receiver coil changes from a double-peaked narrow-band characteristic to a single-peaked wide-band characteristic.

104.   For example, in a Qi compliant receiver coil, such as the NXP WPR1500-HV receiver coil, self-inductance will increase due to existence of a magnetic body. Thus a coupling coefficient (k) between the transmitter coil and the receiver coil will be set to be decreased according to the equation listed in col. 7 of the '282 Specification.



**Table 2. Rx-coil-inductance parameters to be measured during development**

| PARAMETER | Rx COIL WITH Tx SHIELD | Rx COIL WITHOUT Tx SHIELD | BATTERY | MAGNET | SUMMARY |
|---|---|---|---|---|---|
| $L'_S$ | Included | — | — | — | Standard $L'_S$ measurement |
| $L'_S\_m$ | Included | — | — | Included | Exposes the effect of the magnet |
| $L'_S\_b$ | Included | — | Included | — | Exposes the effect of the battery |
| $L'_S\_m\_b$ | Included | — | Included | Included | Exposes the effect of the battery and the magnet together |
| $L_S$ | — | Included | — | — | Standard $L_S$ measurement |
| $L_S\_b$ | — | Included | Included | — | Exposes the effect of the battery |

**Table 3. Measured inductances of a sample coil**

| | $L'_S$ | $L'_S\_m$ | $L'_S\_b$ | $L'_S\_m\_b$ | $L_S$ | $L_S\_b$ |
|---|---|---|---|---|---|---|
| Inductance (µH) | 12.9 | 13.1 | 10.5 | 10.6 | 10.9 | 9.52 |
| Resonance (kHz) | 90.15 | 89.63 | 100 | 99.72 | 98.15 | 105.02 |

https://www.mouser.com/PDFdocs/TI-Designing-a-Qi-compliant-receiver-coil.pdf at pp. 11, 12.

105.   In a Qi compliant receiver coil, such as the NXP WPR1500-HV receiver coil, self inductance will increase due to existence of a magnetic body. Thus, the coupling coefficient (k) between the transmitter coil and the receiver coil will decrease.

106.   The '282 patent explains that when k is high, wide-band operation cannot be achieved because the frequency response (*e.g.*, "frequency characteristics") of the transmission efficiency has a double-peaked narrow-band

response. Therefore, to achieve wide-band operation k should be lowered by increasing self inductances of each of the transmitted coil and the receiver coil.



FIG. **5** is a schematic graph showing frequency characteristics of transmission efficiency when the coupling coefficient k between the transmitter coil **1** and the receiver coil **2** of FIG. **3** is changed. In FIG. **5**, it is assumed that the Q value is constant. According to FIG. **5**, it can be understood that the bandwidth of transmission efficiency changes in accordance with the magnitude of the coupling coefficient k. Normally, when the electromagnetic coupling of the transmitter coil **1** and the receiver coil **2** is strong, a double-peaked narrow-band characteristic results, and wide band operation cannot be achieved. That is, in order to achieve wide band operation, it is beneficial to lower the coupling coefficient k under the condition that the transmitter coil **1** and the receiver coil **2** are adjacent to each other. Since the coupling coefficient k is a ratio of the square root of the self-inductances L**1** and L**2** to the mutual inductance M, the coupling coefficient k can be decreased if the self-inductances L**1** and L**2** can be increased.

U.S. Patent No. 9,620,282 at Fig. 5 7:47-64.

107.   Additionally, when k is higher, the frequency response of the transmission efficiency may be an undesirably a double-peaked narrow-band response.



Fig. 4.   Results of electromagnetic field analysis for efficiency versus frequency at different gap lengths. (a) $g = 49$ mm. (b) $g = 80$ mm. (c) $g = 170$ mm. (d) $g = 357$ mm.

https://sci-hub.ru/10.1109/TIE.2011.2112317 at p. 4747.

108.   When Qi-compliant (*e.g.*, WPCcompliant) components are selected, the k is lowered and the frequency response (*e.g.*, "frequency characteristic") of the transmitter-receiver gain (*e.g.*, "transmission efficiency") changes from a double-

peak narrow-band response to a single-peaked wide-band response.

The total power transfer function from transmitter driving stage to receiver rectifier will show a resonance curve according Figure 10. The A11 transmitter operating frequency can be controlled between 110kHz and 205kHz range, staying at the right side of the resonance. Due to the slope of the resonance curve, the receiver rectifier output voltage can be controlled by changing the transmitter power signal frequency.



Note that the peak amplitude in the curve is dependent on the quality factor of the LC circuit. It is also load dependent. To ensure sufficient voltage gain between transmitter and receiver in all load conditions, the power stage components should be selected based on WPC1.1 requirements.

FIGURE 10 : TX-RX TRANSFER CURVE

https://www.richtek.com/Design%20Support/Technical%20Document/~/media/AN%20PDF/AN036_EN.ashx at p. 8.

# Annex C   Power Receiver design guidelines (informative)

## C.1   Large-signal resonance check

In the course of designing a Power Receiver, it should be verified that the resonance frequency $f_S$ of the dual resonant circuit remains within the tolerance range defined in Section 3.1.1, *Dual resonant circuit*, under large-signal conditions. The test defined in this Annex C.1 serves this purpose.

Step 1. Connect an RF power source to the assembly of Secondary Coil, Shielding and other components that influence the inductance of the Secondary Coil—e.g. a magnetic attractor, see Figure 7 on page 28— and series resonant capacitance $C_S$; see Figure 56. The presence of the parallel capacitance $C_p$ is optional.

**Figure 56. Large signal secondary resonance test**



Step 2. Position the assembly and an appropriate spacer on primary Shielding material, as shown in Figure 7.

Step 3. Measure the input voltage $V_{in}$ as a function of the frequency of the RF power source in the range of 90…110 kHz, while maintaining the input current $I_{in}$ at a constant level, preferably at about twice the maximum value intended in the final product.

Step 4. Verify that the frequency at which the measured $V_{in}$ is at a minimum, occurs within the specified tolerance range of the resonance frequency $f_S$.

WPC – The Qi Wireless Power Transfer System Power Class 0 Specification, Parts 1 and 2: Interface Definitions v. 1.2.3 (available at https://faculty-web.msoe.edu/johnsontimoj/EE4980/files4980/Qi-PC0-part1&2-v1.2.3a.pdf at p. 158).

109.   In each of the '282 Accused Products, a center frequency of the

double-peaked narrow-band characteristic is lower than a center frequency of the

single-peaked wide-band characteristic.

110.    For example, the center frequency of the double-peaked narrow-band characteristic is lower than a center frequency of the single-peaked wide-band characteristic.



Fig. 4.   Results of electromagnetic field analysis for efficiency versus frequency at different gap lengths. (a) $g = 49$ mm. (b) $g = 80$ mm. (c) $g = 170$ mm. (d) $g = 357$ mm.

https://sci-hub.ru/10.1109/TIE.2011.2112317 at p. 4747.

## NATURE OF THE ACTION

111.    NXP infringes, directly and indirectly, certain claims of U.S. Patent Nos 7,796,512, 8,045,531, 8,270,384, 8,552,684, 8,963,490, and 9,620,282 (the

"SPV Asserted Patents").

**NOTICE**

112.   SPV does not currently distribute, sell, offer for sale, or make products embodying the Asserted Patents.

113.   Defendants have received notice of infringement of the Asserted Patents on July 19, 2024, again on January 28, 2025, and again no later than the filing of this complaint (the "Notice Dates").

114.   SPV has complied with all notice requirements of 35 U.S.C. § 287.

**COUNT 1**
**INFRINGEMENT OF U.S. PATENT NO. 7,796,512**

115.   SPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

116.   SPV is the owner, by assignment, of U.S. Patent No. 7,796,512 and holds all substantial rights in and under the '512 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

117.   The '512 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

118.   NXP has infringed, and continues to infringe, the '512 Patent by making, using, offering to sell, selling, licensing, and/or importing '512 Accused Products.

119.   NXP has directly infringed at least claim 1 of the '512 Patent by making, using, selling, offering for sale, licensing, and/or importing into the United States without authority the '512 Accused Products.

120.   The '512 Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '512 Patent and feature functionality comprising the steps noted above.

121.   NXP has used and tested the '512 Accused Products in the United States.

122.   NXP thus has infringed and continues to infringe the '512 Patent.

123.   NXP's activities were without authority of license under the '512 Patent.

124.   NXP's users, customers, agents and/or other third parties (collectively, "third-party infringers") infringed and continue to infringe the asserted claims including under 35 U.S.C. § 271(a) by using the '512 Accused Products according to their normal and intended use.

125.   Since as early as the Notice Dates, NXP has known or been willfully blind to the fact that the third-party infringers' use of '512 Accused Products directly infringes the '512 Patent.

126.   NXP's knowledge of the '512 Patent, which covers operating the '512 Accused Products in their intended manner such that all limitations of the asserted

claims of the '512 Patent are met, extends to its knowledge that the third-party

infringers' use of the '512 Accused Products directly infringes the '512 Patent, or,

at the very least, rendered NXP willfully blind to such infringement.

127.    With knowledge of or willful blindness to the fact that the third-party

infringers' use of the '512 Accused Products in their intended manner such that all

limitations of the asserted claims of the '512 Patent are met directly infringes the

'512 Patent, NXP has actively encouraged the third-party infringers to directly

infringe the '512 Patent by making, using, testing, selling, offering for sale,

importing and/or licensing the Accused Products by, for example: marketing AP

devices using NXP's Wi-Fi SoCs that support 802.11k/r communication session

source switching capabilities to the third-party infringers; supporting and managing

the third-party infringers' use of the 802.11k/r communication session source

switching functionalities; and providing technical assistance to the third-party

infringers during their continued use of the '512 Accused Products such as by, for

example, publishing instructional information on the NXP websites directing and

encouraging third-party infringers how to make and use the 802.11k/r

communication session source switching capabilities of the '512 Accused

Products.

128.    NXP induces the third-party infringers to infringe the asserted claims

of the '512 Patent by directing or encouraging them to operate the '512 Accused

Products which satisfy all limitations of the asserted claims of the '512 Patent. For example, NXP advertises and promotes the 802.11k/r communication session source switching features of the NXP Accused Products and encourages the third-party infringers to operate them in an infringing manner. NXP further provides technical assistance directing and instructing third parties how to operate the '512 Accused Products by, for example, publishing instructional materials, videos, troubleshooting, manuals, and user guides including:

https://www.nxp.com/company/about-nxp/smarter-world-videos/QORIQ-T1023-WLAN-DEMO.

Next Generation IEEE® 802.11ac WLAN System Design with QorIQ T102x and LS10xx Processors - NXP Community.

129.   In response, the third-party infringers acquire and operate the '512 Accused Products in an infringing manner.

130.   NXP specifically intends to induce, and did induce, the third-party infringers to infringe the asserted claims of the '512 Patent, and NXP knew of or was willfully blind to such infringement. NXP advised, encouraged, and/or aided the third-party infringers to engage in direct infringement, including through its encouragement, advice, and assistance to the third-party infringers to use the 802.11k/r communication session source switching features of the '512 Accused Products.  Having known or been willfully blind to the fact that the third-party infringers' use of the '512 Accused Products in their intended manner such that all

limitations of asserted claims of the '512 Patent were met directly infringed the '512 Patent, NXP actively encouraged and induced the third-party infringers to directly infringe the '512 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said '512 Accused Products , and by, for example: marketing the '512 Accused Products to the third-party infringers; supporting and managing the third-party infringers' use of the '512 Accused Products; and providing technical assistance to the third-party infringers during their continued use of the '512 Accused Products by, for example, publishing training videos that instruct third-party infringers how to make and use '512 Accused Products to infringe the asserted claims of the '512 Patent, as well hosting an online forum that allows third-party infringers to have questions about the use of the '512 Accused Products answered.



https://community.nxp.com/t5/T-Series/T1023-EC2-RGMII-connected-to-boardcom-switch/m-p/793091.



https://community.nxp.com/t5/QorIQ/T1023-PCIe-issues/m-p/786105.

131.    Based upon the foregoing facts, among other things, NXP has induced and continues to induce infringement of the asserted claims of the '512 Patent under 35 U.S.C. § 271(b).

132.    NXP has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the '512 Accused Products that are especially made and adapted—and specifically intended by NXP—to be used as components and material parts of the inventions covered by the '512 Patent. For example, the '512 Accused Products include 802.11k/r communication session source switching features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the Accused Products.

133.    NXP knew and intended that the Accused Products would be operated

in a manner that practices the asserted claims of the '512 Patent.

134.   The 802.11k/r communication session source switching features are specially made and adapted to infringe the asserted claims of the '512 Patent.

135.   The 802.11k/r communication session source switching features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the '512 Accused Products solely in a manner that is covered by the '512 Patent, it has no substantial non-infringing use. At least by SPV's notice of NXP's infringement, based upon the foregoing facts, NXP knew of or was willfully blind to the fact that such functionality was specially made and adapted for—and was in fact used in—the Accused Products in a manner that is covered by the '512 Patent.

136.   Based upon the foregoing facts, among other things, NXP has contributorily infringed and continues to contributorily infringe the asserted claims of the '512 Patent under 35 U.S.C. § 271(c).

137.   NXP's acts of infringement of the '512 Patent have continued since the Notice Dates and are, therefore, carried out with knowledge of the asserted claims of the '512 Patent and how the '512 Accused Products infringe them. Rather than take a license to the '512 Patent, NXP's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v.*

*Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

138.    NXP's acts of direct and indirect infringement have caused and continue to cause damage to SPV for which SPV is entitled to recover damages sustained as a result of NXP's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 2
## INFRINGEMENT OF U.S. PATENT NO. 8,045,531

139.    SPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

140.    SPV is the owner, by assignment, of U.S. Patent No. 8,045,531 and holds all substantial rights in and under the '531 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

141.    The '531 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

142.    NXP has infringed, and continues to infringe, the '531 Patent by making, using, offering to sell, selling, licensing, and/or importing '531 Accused Products.

143.    The NXP '531 infringing products include at least the following NXP product IDs; RDR1023WLAN ("'531 Accused Products").

144.   NXP has directly infringed at least claim 1 of the '531 Patent by making, using, selling, offering for sale, licensing, and/or importing into the United States without authority the '531Accused Products.

145.   The '531 Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '531 Patent and feature functionality comprising the steps noted above.

146.   NXP has used and tested the '531Accused Products in the United States.

147.   NXP thus has infringed and continues to infringe the '531 Patent.

148.   NXP's activities were without authority of license under the '531 Patent.

149.   NXP's users, customers, agents and/or other third parties (collectively, "third-party infringers") infringed and continue to infringe the asserted claims including under 35 U.S.C. § 271(a) by using the '531 Accused Products according to their normal and intended use.

150.   Since at least as early as the Notice Dates, NXP has known or been willfully blind to the fact that the third-party infringers' use of '531 Accused Products directly infringes the '531 Patent.

151.   NXP's knowledge of the '531 Patent, which covers operating the '531 Accused Products in their intended manner such that all limitations of the asserted

claims of the '531 Patent are met, extends to its knowledge that the third-party

infringers' use of the WLAN Accused Products directly infringes the '531 Patent,

or, at the very least, rendered NXP willfully blind to such infringement.

152.   With knowledge of or willful blindness to the fact that the third-party

infringers' use of the WLAN Accused Products in their intended manner such that

all limitations of the asserted claims of the '531 Patent are met directly infringes

the '531 Patent, NXP has actively encouraged the third-party infringers to directly

infringe the '531 Patent by making, using, testing, selling, offering for sale,

importing and/or licensing the Accused Products by, for example: marketing

NXP's access point system configured using the CAPWAP protocol capabilities to

provide service in a WLAN to the third-party infringers; supporting and managing

the third-party infringers' use of the WLAN functionalities; and providing

technical assistance to the third-party infringers during their continued use of the

'531 Accused Products such as by, for example, publishing instructional

information on the NXP websites directing and encouraging third-party infringers

how to make and use the WLAN capabilities of the '531 Accused Products.

153.   NXP induces the third-party infringers to infringe the asserted claims

of the '531 Patent by directing or encouraging them to operate the '531 Accused

Products which satisfy all limitations of the asserted claims of the '531 Patent. For

example, NXP advertises and promotes the WLAN of the '531 Accused Products

and encourages the third-party infringers to operate them in an infringing manner. NXP further provides technical assistance directing and instructing third parties how to operate the '531 Accused Products by, for example, publishing instructional materials, videos, troubleshooting, manuals, and user guides.

https://www.nxp.com/company/about-nxp/smarter-world-videos/QORIQ-T1023-WLAN-DEMO.
https://community.nxp.com/t5/NXP-Training-Content/Next-Generation-IEEE-802-11ac-WLAN-System-Design-with-QorIQ/ta-p/1111111.

154.   In response, the third-party infringers acquire and operate the '531 Accused Products in an infringing manner.

155.   NXP specifically intends to induce, and did induce, the third-party infringers to infringe the asserted claims of the '531 Patent, and NXP knew of or was willfully blind to such infringement. NXP advised, encouraged, and/or aided the third-party infringers to engage in direct infringement, including through its encouragement, advice, and assistance to the third-party infringers to use the capabilities of the '531 Accused Products.  Having known or been willfully blind to the fact that the third-party infringers' use of the '531 Accused Products in their intended manner such that all limitations of asserted claims of the '531 Patent were met directly infringed the '531 Patent, NXP actively encouraged and induced the third-party infringers to directly infringe the '531 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said '531 Accused Products , and by, for example: marketing the '531 Accused Products to the third-party

infringers; supporting and managing the third-party infringers' use of the '531 Accused Products; and providing technical assistance to the third-party infringers during their continued use of the '531 Accused Products by, for example, publishing training videos that instruct third-party infringers how to make and use WLAN Accused Products to infringe the asserted claims of the '531 Patent, as well hosting an online forum that allows third-party infringers to have questions about the use of the '531 Accused Products answered.



https://community.nxp.com/t5/T-Series/T1023-EC2-RGMII-connected-to-boardcom-switch/m-p/793091.



https://community.nxp.com/t5/QorIQ/T1023-PCIe-issues/m-p/786105.

156.   Based upon the foregoing facts, among other things, NXP has induced and continues to induce infringement of the asserted claims of the '531 Patent under 35 U.S.C. § 271(b).

157.   NXP has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the '531 Accused Products that are especially made and adapted—and specifically intended by NXP—to be used as components and material parts of the inventions covered by the '531 Patent. For example, the '531 Accused Products include 802.11k/r communication session source switching features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the Accused Products.

158.   NXP knew and intended that the Accused Products would be operated in a manner that practices each asserted claim of the '531 Patent.

159.   The products utilizing WLAN configured using the CAPWAP protocol are specially made and adapted to infringe the asserted claims of the '531 Patent.

160.   The WLAN features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the WLAN

Accused Products solely in a manner that is covered by the '531 Patent, it has no

substantial non-infringing use. At least by SPV's notice of NXP's infringement,

based upon the foregoing facts, NXP knew of or was willfully blind to the fact that

such functionality was specially made and adapted for—and was in fact used in—

the Accused Products in a manner that is covered by the '531 Patent.

161.    Based upon the foregoing facts, among other things, NXP has

contributorily infringed and continues to contributorily infringe the asserted claims

of the '531 Patent under 35 U.S.C. § 271(c).

162.    NXP's acts of infringement of the '531 Patent have continued since

the Notice Dates and are, therefore, carried out with knowledge of the asserted

claims of the '531 Patent and how the WLAN Accused Products infringe them.

Rather than take a license to the '531 Patent, NXP's ongoing infringing conduct

reflects a business decision to "efficiently infringe" the asserted claims and in

doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v.

Pulse Elecs., Inc*., 136 S. Ct. 1923 (2016).

163.    NXP's acts of direct and indirect infringement have caused and

continue to cause damage to SPV for which SPV is entitled to recover damages

sustained as a result of NXP's infringing acts in an amount subject to proof at trial,

which, by law, cannot be less than a reasonable royalty, together with interest and

costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 3
## INFRINGEMENT OF U.S. PATENT NO. 8,270,384

164.    SPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

165.    SPV is the owner, by assignment, of U.S. Patent No. 8,270,384 and holds all substantial rights in and under the '384 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past infringement.

166.    The '384 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

167.    NXP has infringed the '384 Patent by making, using, offering to sell, selling, licensing, and/or importing the '384 Accused Products before expiry of the patent.

168.    NXP has directly infringed at least claim 1 of the '384 Patent by making, using, selling, offering for sale, licensing, and/or importing into the United States before expiry of the patent without authority the '384 Accused Products.

169.    The '384 Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '384 Patent and feature functionality comprising the steps noted above.

170.    NXP has used and tested the '384 Accused Products in the United States before expiry of the patent.

171. NXP thus has infringed the '384 Patent before expiry of the patent.

172. NXP's activities were without authority of license under the '384 Patent.

173. NXP's users, customers, agents and/or other third parties (collectively, "third-party infringers") infringed the asserted claims including under 35 U.S.C. § 271(a) by using the '384 Accused Products according to their normal and intended use before expiry of the patent.

174. Since at least the Notice Dates, NXP has known or been willfully blind to the fact that the third-party infringers' use of '384 Accused Products before expiry of the patent directly infringes the '384 Patent.

175. NXP's knowledge of the '384 Patent, which covers operating the '384 Accused Products in their intended manner such that all limitations of the asserted claims of the '384 Patent are met, extends to its knowledge that the third-party infringers' use of the '384 Accused Products directly infringed the '384 Patent, or, at the very least, rendered NXP willfully blind to such infringement before expiry of the patent.

176. With knowledge of or willful blindness to the fact that the third-party infringers' use of the '384 Accused Products in their intended manner such that all limitations of the asserted claims of the '384 Patent are met directly infringes the '384 Patent, NXP actively encouraged the third-party infringers to directly infringe

the '384 Patent before expiry of the patent by making, using, testing, selling, offering for sale, importing and/or licensing the Accused Products by, for example: marketing NXP's access point system configured using the CAPWAP protocol capabilities to provide service in a WLAN to the third-party infringers; supporting and managing the third-party infringers' use of the WLAN functionalities; and providing technical assistance to the third-party infringers during their continued use of the '384 Accused Products such as by, for example, publishing instructional information on the NXP websites directing and encouraging third-party infringers how to make and use the WLAN capabilities of the '384 Accused Products.

177.    NXP induced the third-party infringers to infringe the asserted claims of the '384 Patent by directing or encouraging them to operate the '384 Accused Products which satisfy all limitations of the asserted claims of the '384 Patent before expiry of the patent. For example, NXP advertised and promoted the WLAN of the '384 Accused Products and encouraged the third-party infringers to operate them in an infringing manner. NXP further provided technical assistance directing and instructing third parties how to operate the '384 Accused Products by, for example, publishing instructional materials, videos, troubleshooting, manuals, and user guides.

https://www.nxp.com/company/about-nxp/smarter-world-videos/QORIQ-T1023-WLAN-DEMO.

https://community.nxp.com/t5/NXP-Training-Content/Next-Generation-IEEE-802-

11ac-WLAN-System-Design-with-QorIQ/ta-p/1111111.

178.   In response, the third-party infringers acquired and operated the '384 Accused Products in an infringing manner.

179.   NXP specifically intended to induce, and did induce, the third-party infringers to infringe the asserted claims of the '384 Patent, and NXP knew of or was willfully blind to such infringement before expiry of the patent. NXP advised, encouraged, and/or aided the third-party infringers to engage in direct infringement, including through its encouragement, advice, and assistance to the third-party infringers to use the capabilities of the '384 Accused Products.  Having known or been willfully blind to the fact that the third-party infringers' use of the '384 Accused Products in their intended manner such that all limitations of asserted claims of the '384 Patent were met directly infringed the '384 Patent, NXP actively encouraged and induced the third-party infringers to directly infringe the '384 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said '384 Accused Products before expiry of the patent, and by, for example: marketing the '384 Accused Products to the third-party infringers; supporting and managing the third-party infringers' use of the '384 Accused Products; and providing technical assistance to the third-party infringers during their continued use of the '384 Accused Products by, for example, publishing training videos that instruct third-party infringers how to make and use '384

Accused Products to infringe the asserted claims of the '384 Patent, as well hosting an online forum that allows third-party infringers to have questions about the use of the '384 Accused Products answered.



https://community.nxp.com/t5/T-Series/T1023-EC2-RGMII-connected-to-boardcom-switch/m-p/793091.



https://community.nxp.com/t5/QorIQ/T1023-PCIe-issues/m-p/786105.

180.    Based upon the foregoing facts, among other things, NXP induced infringement of the asserted claims of the '384 Patent under 35 U.S.C. § 271(b) before expiry of the patent.

181.   NXP has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the '384 Accused Products that are especially made and adapted—and specifically intended by NXP—to be used as components and material parts of the inventions covered by the '384 Patent. For example, the WLAN Accused Products include 802.11k/r communication session source switching features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the Accused Products.

182.   NXP knew and intended that the Accused Products would be operated in a manner that practices each asserted claim of the '384 Patent.

183.   The products utilizing WLAN configured using the CAPWAP protocol are specially made and adapted to infringe the asserted claims of the '384 Patent.

184.   The WLAN features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the '384 Accused Products solely in a manner that is covered by the '384 Patent, it has no substantial non-infringing use. At least by SPV's notice of NXP's infringement, based upon the foregoing facts, NXP knew of or was willfully blind to the fact that such functionality was specially made and adapted for—and was in fact used in—

the Accused Products in a manner that is covered by the '384 Patent.

185.    Based upon the foregoing facts, among other things, NXP has contributorily infringed the asserted claims of the '384 Patent under 35 U.S.C. § 271(c) before expiry of the patent.

186.    NXP's acts of infringement of the '384 Patent continue since the Notice Dates until expiry of the patent and were, therefore, carried out with knowledge of the asserted claims of the '384 Patent and how the '384 Accused Products infringe them.  Rather than take a license to the '384 Patent, NXP's ongoing infringing conduct reflected a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc*., 136 S. Ct. 1923 (2016).

187.    NXP's acts of direct and indirect infringement caused damage to SPV for which SPV is entitled to recover damages sustained as a result of NXP's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 4
## INFRINGEMENT OF U.S. PATENT NO. 8,552,684

188.    SPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

189.    SPV is the owner, by assignment, of U.S. Patent No. 8,552,684 and

holds all substantial rights in and under the '684 Patent, including the right to grant

licenses, exclude others, and to enforce, sue, and recover damages for past and

future infringement.

190.   The '684 Patent is valid, enforceable and was duly issued in full

compliance with Title 35 of the United States Code.

191.   SPV alleges that NXP has infringed, and continues to infringe, the

'684 Patent by making, using, offering to sell, selling, licensing, and/or importing

'684 Accused Products.

192.   NXP has directly infringed at least claim 1 of the '684 Patent by

making, using, selling, offering for sale, licensing, and/or importing into the United

States without authority the '684 Accused Products.

193.   The '684 Accused Products are designed, manufactured, and intended

to be used in normal operation to practice the '684 Patent and feature functionality

comprising the steps noted above.

194.   NXP has used and tested the '684 Accused Products in the United

States.

195.   NXP thus has infringed and continues to infringe the '684 Patent.

196.   NXP's activities were without authority of license under the '684

Patent.

197.   NXP's users, customers, agents and/or other third parties

(collectively, "third-party infringers") infringed and continue to infringe the asserted claims including under 35 U.S.C. § 271(a) by using the '684 Accused Products according to their normal and intended use.

198.   Since at least as early as the Notice Dates, NXP has known or been willfully blind to the fact that the third-party infringers' use of '684 Accused Products directly infringes the '684 Patent.

199.   NXP's knowledge of the '684 Patent, which covers operating the '684Accused Products in their intended manner such that all limitations of the asserted claims of the '684 Patent are met, extends to its knowledge that the third-party infringers' use of the '684 Accused Products directly infringes the '684 Patent, or, at the very least, rendered NXP willfully blind to such infringement.

200.   With knowledge of or willful blindness to the fact that the third-party infringers' use of the '684 Accused Products in their intended manner such that all limitations of the asserted claims of the '684 Patent are met directly infringes the '684 Patent, NXP has actively encouraged the third-party infringers to directly infringe the '684 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the Accused Products by, for example: marketing wireless charging capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the wireless charging capabilities; and providing technical assistance to the third-party infringers during their continued

use of the '684 Accused Products such as by, for example, publishing instructional information on the NXP websites directing and encouraging third-party infringers how to make and use the wireless charging capabilities of the '684 Accused Products.

201.   NXP induces the third-party infringers to infringe the asserted claims of the '684 Patent by directing or encouraging them to operate the '684 Accused Products which satisfy all limitations of the asserted claims of the '684 Patent. For example, NXP advertises and promotes the wireless charging capabilities of the '684Accused Products and encourages the third-party infringers to operate them in an infringing manner. NXP further provides technical assistance directing and instructing third parties how to operate the '684 Accused Products by, for example, publishing instructional materials, videos, troubleshooting, manuals, and user guides.

202.   In response, the third-party infringers acquire and operate the '684 Accused Products in an infringing manner.

203.   NXP specifically intends to induce, and did induce, the third-party infringers to infringe the asserted claims of the '684 Patent, and NXP knew of or was willfully blind to such infringement. NXP advised, encouraged, and/or aided the third-party infringers to engage in direct infringement, including through its encouragement, advice, and assistance to the third-party infringers to use the

capabilities of the '684 Accused Products.  Having known or been willfully blind to the fact that the third-party infringers' use of the '684 Accused Products in their intended manner such that all limitations of asserted claims of the '684 Patent were met directly infringed the '684 Patent, NXP actively encouraged and induced the third-party infringers to directly infringe the '684 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said '684 Accused Products , and by, for example: marketing the '684 Accused Products to the third-party infringers; supporting and managing the third-party infringers' use of the '684 Accused Products; and providing technical assistance to the third-party infringers during their continued use of the '684 Accused Products by, for example, publishing training videos that instruct third-party infringers how to make and use '684 Accused Products to infringe the asserted claims of the '684 Patent, as well hosting an online forum that allows third-party infringers to have questions about the use of the '684 Accused Products answered.



https://community.nxp.com/t5/Power-Management/15-Watt-Wireless-Charging-Transmitter-Qi2-compliant/m-p/2033454.



https://community.nxp.com/t5/Power-Management/QI-Wireless-Power-receiver-MWPR1516/m-p/1598034.

204.   Based upon the foregoing facts, among other things, NXP has induced and continues to induce infringement of the asserted claims of the '684 Patent under 35 U.S.C. § 271(b).

205.   NXP has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the '684 Accused Products that are especially made and adapted—and specifically intended by NXP—to be used as components and material parts of the inventions covered by the '684 Patent. For example, the '684 Accused Products include Qi specification compliant wireless charging features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of

the intended functionality of the Accused Products.

206.  NXP knew and intended that the Accused Products would be operated in a manner that practices each asserted claim of the '684 Patent.

207.  The products utilizing wireless according to the Qi wireless charging specification are specially made and adapted to infringe the asserted claims of the '684 Patent.

208.  The wireless charging features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the '684 Accused Products solely in a manner that is covered by the '684 Patent, it has no substantial non-infringing use. At least by SPV's notice of NXP's infringement, based upon the foregoing facts, NXP knew of or was willfully blind to the fact that such functionality was specially made and adapted for—and was in fact used in— the Accused Products in a manner that is covered by the '684 Patent.

209.  Based upon the foregoing facts, among other things, NXP has contributorily infringed and continues to contributorily infringe the asserted claims of the '684 Patent under 35 U.S.C. § 271(c).

210.  NXP's acts of infringement of the '684 Patent have continued since the Notice Dates and are, therefore, carried out with knowledge of the asserted claims of the '684 Patent and how the WLAN Accused Products infringe them. Rather than take a license to the '684 Patent, NXP's ongoing infringing conduct

reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

211.   NXP's acts of direct and indirect infringement have caused and continue to cause damage to SPV for which SPV is entitled to recover damages sustained as a result of NXP's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 5
## INFRINGEMENT OF U.S. PATENT NO. 8,963,490

212.   SPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

213.   SPV is the owner, by assignment, of U.S. Patent No. 8,963,490 and holds all substantial rights in and under the '490 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

214.   The '490 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

215.   SPV alleges that NXP has infringed, and continues to infringe, the '490 Patent by making, using, selling, offering to sell, licensing, and/or importing '490 Accused Products.

216.    NXP has directly infringed at least claim 1 of the '490 Patent by making, using, selling, offering for sale, licensing, and/or importing into the United States without authority the '490 Accused Products.

217.    The '490 Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '490 Patent and feature functionality comprising the steps noted above.

218.    NXP has used and tested the '490 Accused Products in the United States.

219.    NXP thus has infringed and continues to infringe the '490 Patent.

220.    NXP's activities were without authority of license under the '490 Patent.

221.    NXP's users, customers, agents and/or other third parties (collectively, "third-party infringers") infringed and continue to infringe the asserted claims including under 35 U.S.C. § 271(a) by using the '490 Accused Products according to their normal and intended use.

222.    Since at least as early as the Notice Dates, NXP has known or been willfully blind to the fact that the third-party infringers' use of '490 Accused Products directly infringes the '490 Patent.

223.    NXP's knowledge of the '490 Patent, which covers operating the '490 Accused Products in their intended manner such that all limitations of the asserted

claims of the '490 Patent are met, extends to its knowledge that the third-party

infringers' use of the'490 Accused Products directly infringes the '490 Patent, or,

at the very least, rendered NXP willfully blind to such infringement.

224.   With knowledge of or willful blindness to the fact that the third-party

infringers' use of the'490 Accused Products in their intended manner such that all

limitations of the asserted claims of the '490 Patent are met directly infringes the

'490 Patent, NXP has actively encouraged the third-party infringers to directly

infringe the '490 Patent by making, using, testing, selling, offering for sale,

importing and/or licensing the Accused Products by, for example: marketing

wireless charging capabilities to the third-party infringers; supporting and

managing the third-party infringers' use of the wireless charging capabilities; and

providing technical assistance to the third-party infringers during their continued

use of the'490 Accused Products such as by, for example, publishing instructional

information on the NXP websites directing and encouraging third-party infringers

how to make and use the wireless charging capabilities of the'490 Accused

Products.

225.   NXP induces the third-party infringers to infringe the asserted claims

of the '490 Patent by directing or encouraging them to operate the'490 Accused

Products which satisfy all limitations of the asserted claims of the '490 Patent. For

example, NXP advertises and promotes the wireless charging capabilities of

the'490 Accused Products and encourages the third-party infringers to operate them in an infringing manner. NXP further provides technical assistance directing and instructing third parties how to operate the'490 Accused Products by, for example, publishing instructional materials, videos, troubleshooting, manuals, and user guides.

226.    In response, the third-party infringers acquire and operate the'490 Accused Products in an infringing manner.

227.    NXP specifically intends to induce, and did induce, the third-party infringers to infringe the asserted claims of the '490 Patent, and NXP knew of or was willfully blind to such infringement. NXP advised, encouraged, and/or aided the third-party infringers to engage in direct infringement, including through its encouragement, advice, and assistance to the third-party infringers to use the capabilities of the'490 Accused Products.  Having known or been willfully blind to the fact that the third-party infringers' use of the'490 Accused Products in their intended manner such that all limitations of asserted claims of the '490 Patent were met directly infringed the '490 Patent, NXP actively encouraged and induced the third-party infringers to directly infringe the '490 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said'490 Accused Products , and by, for example: marketing the'490 Accused Products to the third-party infringers; supporting and managing the third-party infringers' use of the '490

Accused Products; and providing technical assistance to the third-party infringers during their continued use of the'490 Accused Products by, for example, publishing training videos that instruct third-party infringers how to make and use'490 Accused Products to infringe the asserted claims of the '490 Patent, as well hosting an online forum that allows third-party infringers to have questions about the use of the'490 Accused Products answered.



https://community.nxp.com/t5/Power-Management/15-Watt-Wireless-Charging-Transmitter-Qi2-compliant/m-p/2033454.



https://community.nxp.com/t5/Power-Management/QI-Wireless-Power-receiver-MWPR1516/m-p/1598034.

228.   Based upon the foregoing facts, among other things, NXP has induced and continues to induce infringement of the asserted claims of the '490 Patent under 35 U.S.C. § 271(b).

229.   NXP has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the'490 Accused Products that are especially made and adapted—and specifically intended by NXP—to be used as components and material parts of the inventions covered by the '490 Patent. For example, the'490 Accused Products include Qi specification compliant wireless charging features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the Accused Products.

230.   NXP knew and intended that the Accused Products would be operated in a manner that practices each asserted claim of the '490 Patent.

231.   The products utilizing wireless according to the Qi wireless charging specification are specially made and adapted to infringe the asserted claims of the '490 Patent.

232.   The wireless charging features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the'490

Accused Products solely in a manner that is covered by the '490 Patent, it has no substantial non-infringing use. At least by SPV's notice of NXP's infringement, based upon the foregoing facts, NXP knew of or was willfully blind to the fact that such functionality was specially made and adapted for—and was in fact used in— the Accused Products in a manner that is covered by the '490 Patent.

233.    Based upon the foregoing facts, among other things, NXP has contributorily infringed and continues to contributorily infringe the asserted claims of the '490 Patent under 35 U.S.C. § 271(c).

234.    NXP's acts of infringement of the '490 Patent have continued since the Notice Dates and are, therefore, carried out with knowledge of the asserted claims of the '490 Patent and how the WLAN Accused Products infringe them. Rather than take a license to the '490 Patent, NXP's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

235.    NXP's acts of direct and indirect infringement have caused and continue to cause damage to SPV for which SPV is entitled to recover damages sustained as a result of NXP's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 6
## INFRINGEMENT OF U.S. PATENT NO. 9,620,282

236.    SPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

237.    SPV is the owner, by assignment, of U.S. Patent No. 9,620,282 and holds all substantial rights in and under the '282 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

238.    The '282 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

239.    SPV alleges that NXP has infringed, and continues to infringe, the '490 Patent by making, using, offering to sell, selling, licensing, and/or importing the '282 Accused Products"

240.    NXP has directly infringed at least claim 1 of the '282 Patent by making, using, selling, offering for sale, licensing, and/or importing into the United States without authority the '282 Accused Products.

241.    The '282 Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '282 Patent and feature functionality comprising the steps noted above.

242.    NXP has used and tested the '282 Accused Products in the United States.

243.   NXP thus has infringed and continues to infringe the '282 Patent.

244.   NXP's activities were without authority of license under the '282 Patent.

245.   NXP's users, customers, agents and/or other third parties (collectively, "third-party infringers") infringed and continue to infringe the asserted claims including under 35 U.S.C. § 271(a) by using the '282 Accused Products according to their normal and intended use.

246.   Since at least as early as the Notice Dates, NXP has known or been willfully blind to the fact that the third-party infringers' use of '282 Accused Products directly infringes the '282 Patent.

247.   NXP's knowledge of the '282 Patent, which covers operating the '282 Accused Products in their intended manner such that all limitations of the asserted claims of the '282 Patent are met, extends to its knowledge that the third-party infringers' use of the '282 Accused Products directly infringes the '282 Patent, or, at the very least, rendered NXP willfully blind to such infringement.

248.   With knowledge of or willful blindness to the fact that the third-party infringers' use of the '282 Accused Products in their intended manner such that all limitations of the asserted claims of the '282 Patent are met directly infringes the '282 Patent, NXP has actively encouraged the third-party infringers to directly infringe the '282 Patent by making, using, testing, selling, offering for sale,

importing and/or licensing the Accused Products by, for example: marketing wireless charging capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the wireless charging capabilities; and providing technical assistance to the third-party infringers during their continued use of the '282 Accused Products such as by, for example, publishing instructional information on the NXP websites directing and encouraging third-party infringers how to make and use the wireless charging capabilities of the '282 Accused Products.

249.   NXP induces the third-party infringers to infringe the asserted claims of the '282 Patent by directing or encouraging them to operate the '282 Accused Products which satisfy all limitations of the asserted claims of the '282 Patent. For example, NXP advertises and promotes the wireless charging capabilities of the '282 Accused Products and encourages the third-party infringers to operate them in an infringing manner. NXP further provides technical assistance directing and instructing third parties how to operate the '282 Accused Products by, for example, publishing instructional materials, videos, troubleshooting, manuals, and user guides.

250.   In response, the third-party infringers acquire and operate the '282 Accused Products in an infringing manner.

251.   NXP specifically intends to induce, and did induce, the third-party

infringers to infringe the asserted claims of the '282 Patent, and NXP knew of or was willfully blind to such infringement. NXP advised, encouraged, and/or aided the third-party infringers to engage in direct infringement, including through its encouragement, advice, and assistance to the third-party infringers to use the capabilities of the '282 Accused Products.  Having known or been willfully blind to the fact that the third-party infringers' use of the '282 Accused Products in their intended manner such that all limitations of asserted claims of the '282 Patent were met directly infringed the '282 Patent, NXP actively encouraged and induced the third-party infringers to directly infringe the '282 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said '282 Accused Products , and by, for example: marketing the '282 Accused Products to the third-party infringers; supporting and managing the third-party infringers' use of the '282 Accused Products; and providing technical assistance to the third-party infringers during their continued use of the '282 Accused Products by, for example, publishing training videos that instruct third-party infringers how to make and use '282 Accused Products to infringe the asserted claims of the '282 Patent, as well hosting an online forum that allows third-party infringers to have questions about the use of the '282 Accused Products answered.



https://community.nxp.com/t5/Power-Management/15-Watt-Wireless-Charging-Transmitter-Qi2-compliant/m-p/2033454.



https://community.nxp.com/t5/Power-Management/QI-Wireless-Power-receiver-MWPR1516/m-p/1598034.

252.    Based upon the foregoing facts, among other things, NXP has induced and continues to induce infringement of the asserted claims of the '282 Patent under 35 U.S.C. § 271(b).

253.    NXP has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the '282 Accused Products that are

especially made and adapted—and specifically intended by NXP—to be used as components and material parts of the inventions covered by the '282 Patent. For example, the '282 Accused Products include Qi specification compliant wireless charging features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the Accused Products.

254.   NXP knew and intended that the Accused Products would be operated in a manner that practices each asserted claim of the '282 Patent.

255.   The products utilizing wireless according to the Qi wireless charging specification are specially made and adapted to infringe the asserted claims of the '282 Patent.

256.   The wireless charging features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the '282 Accused Products solely in a manner that is covered by the '282 Patent, it has no substantial non-infringing use. At least by SPV's notice of NXP's infringement, based upon the foregoing facts, NXP knew of or was willfully blind to the fact that such functionality was specially made and adapted for—and was in fact used in— the Accused Products in a manner that is covered by the '282 Patent.

257.   Based upon the foregoing facts, among other things, NXP has

contributorily infringed and continues to contributorily infringe the asserted claims of the '282 Patent under 35 U.S.C. § 271(c).

258.   NXP's acts of infringement of the '282 Patent have continued since the Notice Dates and are, therefore, carried out with knowledge of the asserted claims of the '282 Patent and how the WLAN Accused Products infringe them. Rather than take a license to the '490 Patent, NXP's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

259.   NXP's acts of direct and indirect infringement have caused and continue to cause damage to SPV for which SPV is entitled to recover damages sustained as a result of NXP's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

**NOTICE**
**NOTICE OF REQUIREMENT OF LITIGATION HOLD**

260.   NXP is hereby notified it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that NXP knows, or reasonably should know, may be relevant to

actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

261.   As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of NXP's agents, resellers, distributors or employees if NXP's electronically stored

information resides there.

262.   NXP is hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to NXP's claims and/or defenses.  To avoid such a result, NXP's preservation duties include, but are not limited to, the requirement that NXP immediately notify its agents, distributors, and employees to halt and/or supervise the auto-delete functions of NXP's electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## JURY DEMAND

SPV hereby demands a trial by jury on all claims, issues, and damages so triable.

## PRAYER FOR RELIEF

SPV prays for the following relief:

a.  That NXP be summoned to appear and answer;

b.  That the Court enter judgment that NXP has infringed the '512, '531, '384, '684, '490 and '282 Patents.

c.  That the Court grant SPV judgment against NXP for all actual, consequential, special, punitive, increased, and/or statutory damages, including, if necessary, an accounting of all damages; pre- and post-judgment interest as allowed by law; and reasonable attorney's fees,

costs, and expenses incurred in this action;

d.  That NXP's infringement be found to have been willful;

e.  That this case be found to be exceptional under 35 U.S.C. § 285; and

f.  That SPV be granted such other and further relief as the Court may

deem just and proper under the circumstances.

Dated:  September 29, 2025          Respectfully submitted,

CONNOR LEE & SHUMAKER PLLC

By:  _Cabrach Connor_
     Cabrach J. Connor
     Cab@CLandS.com
     Texas Bar No. 24036390
     Jennifer Tatum Lee
     Jennifer@CLandS.com
     Texas Bar No. 24046950
     John M. Shumaker
     John@CLandS.com
     Texas Bar No. 24033069

     609 Castle Ridge Road, Suite 450
     Austin, Texas 78746
     512.646.2060 Telephone
     888.387.1134 Facsimile